## UNITED STATES POSTAL SERVICE

### v.

## NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL–CIO, Appellant.

### No. 92–5076.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 1993.

Decided Nov. 23, 1993.

---

Keith E. Secular, argued the cause, for appellant. With him on the brief was Earl R. Pfeffer.

Bruce R. Hegyi, Asst. U.S. Atty., argued the cause, for appellee. With him on the brief were J. Ramsey Johnson, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., and Robert Sindermann, Jr., Atty., United States Postal Service. Jim

Layton, Asst. U.S. Atty., entered an appearance.

Before SILBERMAN, STEPHEN F. WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion filed by Circuit Judge SILBERMAN.

Opinion concurring in part and concurring in the judgment filed by Circuit Judge STEPHEN F. WILLIAMS.

Dissenting Opinion filed by Circuit Judge RANDOLPH.

SILBERMAN, Circuit Judge:

The National Association of Letter Carriers appeals from the judgment of the district court authorizing the Postal Service to disregard an arbitrator's award as contrary to the Privacy Act. We reverse and remand for further proceedings.

## I.

Pursuant to their duty to bargain collectively under the National Labor Relations Act,[1] 29 U.S.C. § 151 *et seq.* (1988), the Postal Service and the National Association of Letter Carriers have executed a number of collective bargaining agreements. The relevant one for purposes of this case became effective on July 21, 1987. Article 31.3 of that agreement provides:

> The Employer will make available for inspection by the Unions all relevant information *necessary* for collective bargaining or the enforcement, administration or interpretation of this Agreement, including information necessary to determine whether to file or to continue the processing of a grievance under this Agreement. Upon the request of the Union, the Employer will furnish such information, provided, however, that the Employer may require the Union to reimburse the USPS for any costs reasonably incurred in obtaining the information. (emphasis added).

---

1. The Postal Service is covered by the NLRA, and not the Federal Service Labor–Management Relations Act (FSLMRA), 5 U.S.C. § 7101 *et seq.* (1988).

Invoking this article, the union requested that the Postal Service provide, in "unscrambled form" (that is, keyed to each employee's name and social security number) the following categories of information regarding each postal service employee in the bargaining units represented by the union: sex; date of birth; minority status code; handicap status code; veteran preference status code; life insurance status code; thrift savings plan status code; thrift savings plan deduction—percent; and thrift savings plan deduction—amount. These latter items would provide the union with information concerning each employee's participation in thrift and life insurance plans provided by the Postal Service as a fringe benefit.

The Postal Service refused the request (it offered the material in scrambled form) because it believed that the information the union requested did not fall within Article 31.3—it was not *"necessary* for collective bargaining"—and, in any event, that the Postal Service was precluded from disclosing the information under the Privacy Act, which prohibits federal agencies from disclosing certain information about individuals, including information about those in the Postal Service. The union disagreed on both points. As to the latter, the union relied on an exception to the Privacy Act authorizing disclosures of information concerning employees if the disclosure is "for a routine use," 5 U.S.C. § 552a(b)(3) (1988), which is defined only as a "use for a purpose which is *compatible* with the purpose for which it was collected," 5 U.S.C. § 552a(a)(7) (1988) (emphasis added). However, under the Act a government agency must notify employees as to such uses. The agency must publish in the Federal Register a notice of "each routine use of the records contained in the system, including the categories of users and the purpose of such use," 5 U.S.C. § 552a(e)(4)(D) (1988), and must also "inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual" of the routine uses to which the information is subject. 5 U.S.C. § 552a(e)(3)(C) (1988).

The Postal Service had published a list of routine uses which included one that specifically applies to disclosures to labor organizations. Routine Use M provides:

M. Disclosure to Labor Organizations

Pursuant to the National Labor Relations Act, records from this system may be furnished to a labor organization upon its request *when needed* by that organization to perform properly its duties as the collective bargaining representative of postal employees in an appropriate bargaining unit.

54 Fed.Reg. at 43,655 (emphasis added).

The parties submitted their dispute as to the meaning of the contractual phase "necessary for collective bargaining" to an arbitrator. The Postal Service, however, reserved its Privacy Act objections—that Routine Use M did not authorize disclosure—for judicial review. The arbitrator decided that the information requested was "necessary for collective bargaining" within the meaning of the contract.[2] According to him, information is "necessary for collective bargaining" within the meaning of the contract so long as the union truthfully alleges that it needs the information, which seems a rather loose standard. But since the Postal Service has not challenged that interpretation, it must be assumed—as a matter of law—that it has *agreed* to that standard in the contract.

The Postal Service then filed a declaratory judgment action in the district court which asserted that compliance with the award would nevertheless violate the Privacy Act. The union counter-claimed for enforcement of the award under section 301 of the Labor Management Relations Act. The district court, relying on our decision in *FLRA v. United States Dep't of the Treasury, Financial Management Serv.,* 884 F.2d 1446 (D.C.Cir.), *cert. denied,* 493 U.S. 1055, 110 S.Ct. 863, 864, 107 L.Ed.2d 947, 948 (1989) (*Treasury* ), granted the Postal Service's motion for summary judgment, "it appearing to the Court that the USPS cannot lawfully be

---

2. The arbitrator's decision did not extend to the employees' minority status code, which the arbitrator held to be non-disclosable under an EEOC regulation.

compelled to release to NALC the information sought." This appeal followed.

## II.

### A.

■ The union argues that the Privacy Act constitutes no impediment to the Postal Service's compliance with the arbitrator's award because the award—which is "a part of the continuous collective bargaining process," *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960), under the National Labor Relations Act, and therefore entitled to extraordinary deference by the federal judiciary, *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 598–99, 80 S.Ct. 1358, 1360, 1361–62, 4 L.Ed.2d 1424 (1960)—is conclusive on the virtually identical question of the interpretation of the Postal Service's routine use notice. That is to say, there can be no meaningful difference between the arbitrator's unchallenged—probably unchallengeable—construction of the phrase in the collective bargaining agreement, "information necessary for collective bargaining," and the phrase in the Postal Service's Routine Use M notice, "when needed by [a labor organization] to perform properly its duties as the collective bargaining representative." Indeed, if there were any difference in meaning, according to the union, the routine use notice authorizes broader disclosure than the contract language requires; that which is needed by a union might not be quite necessary.[3]

The Postal Service stresses not so much the linguistic differences between the two phrases, but rather the different authority and law that governs them. Notwithstanding the arbitrator's broad power to interpret collective bargaining agreements, the routine use notice is not such an agreement; the Postal Service itself is the prime source of the meaning of its own regulation. The government relies on our prior opinion in *Treasury, supra*, in which we held that a similar routine use notice published by OPM could not be construed by the Federal Labor Relations Authority contrary to a reasonable OPM interpretation. The Authority, as well as we, were obliged to accept the agency interpretation that concluded that the names and addresses of federal employees were not "necessary" for "collective bargaining." *Treasury*, 884 F.2d at 1456.[4]

The government's reliance on *Treasury* is, however, unavailing because here we have no agency interpretation of the routine use language to which deference is due. In *Treasury* we discussed extensively the reasons why we could rely on the OPM Director's letter to the Justice Department, setting forth a more restrictive interpretation than

---

3. The routine use notice, of course, in part protects the Postal Service against employee claims under the Privacy Act, so it would not be illogical that it would actually be broader.

4. In *Treasury* we assumed—and the parties did not contest—that the FSLMRA was subordinate to the Privacy Act because 5 U.S.C. § 7114(b)(4) requires government agencies to supply data to federal employee unions only "to the extent not prohibited by law." *See Treasury*, 884 F.2d at 1450; *see also id.*, 884 F.2d at 1457 (Ruth B. Ginsburg, J., concurring). The relationship between the Privacy Act and the NLRA insofar as the Postal Service is involved makes the viability of that assumption here somewhat less clear. On the one hand, by placing the Postal Service under the National Labor Relations Act rather than the FSLMRA Congress presumably intended the Postal Service to be subject to the same rules that apply to private employers. *See American Postal Workers Union v. United States Postal Serv.*, 823 F.2d 466, 469 (11th Cir.1987). One

might doubt, therefore, that Congress meant the Privacy Act to be used by the Postal Service to reject union requests that would be sanctioned under the National Labor Relations Act. On the other hand, four years before the enactment of the Privacy Act Congress specified that the Postal Service would be subject to the NLRA "to the extent not inconsistent with provisions of [Title 39]." *See* Postal Reorganization Act, Pub.L. No. 91–375, § 1209(a), 84 Stat. 737 (1970) (codified at 39 U.S.C. § 1209(a) (1986)). Title 39 now provides that the Postal Service is subject to the Privacy Act. *See* 39 U.S.C. § 410(b)(1). Thus, although the Congress that limited the reach of the NLRA by the provisions of Title 39 could not have been thinking about the Privacy Act, it could very well be argued that the premise of our *Treasury* opinion—that the Privacy Act predominates over inconsistent provisions of labor law—applies with equal force here. At any rate, the parties both assume that if a direct conflict between the arbitrator's award and the Privacy Act exists, the Privacy Act's dictates would control.

similar language in the FSLMRA,[5] as an official interpretation of the routine use notice. *See Treasury*, 884 F.2d at 1454–55. In this case we have not been offered any general construction of the routine use wording. The Postal Service is unable or unwilling to suggest any explanation of the term; it just insists that the information sought is not, in fact, needed by the union for collective bargaining. Under those circumstances, deference to the Postal Service would merely mean deference to its current litigating position simpliciter—which we will not accept. *Treasury*, 884 F.2d at 1455–56.

Once the issue of deference to the Postal Service interpretation of Routine Use M is out of the picture, there is no reason why the Postal Service should not be required to comply with the arbitrator's award. That is not, however, because we should independently make our own judgment as to whether the information is "needed" for collective bargaining.[6] Through Routine Use M, the Postal Service has itself deferred to the responsible tribunals with authority to set forth the Postal Service and the union's obligation to bargain under the National Labor Relations Act—and those include the arbitrator. To be sure, in *Treasury* the agency had employed similar language in its routine use notice, but the agency pointed to an official interpretation that rebutted any suggestion that the agency meant to defer to the FLRA as to that agency's view as to what information was needed for collective bargaining.

The key phrase in the notice is "pursuant to the National Labor Relations Act" which, of course, refers to the Postal Service duties under that act. One of these duties—perhaps the most important for an employer in the Postal Service's position—is the duty to bargain in good faith. And, section 8(a)(5) of the N.L.R.A., *see* 29 U.S.C. § 158(a)(5)

(1988), which sets forth that duty, requires the disclosure to a union, the collective bargaining representative of the employees, of a good deal of information concerning the employees. *See Oil Chemical & Atomic Workers Local Union v. NLRB*, 711 F.2d 348, 358 (D.C.Cir.1983); *NLRB v. George Koch Sons, Inc.*, 950 F.2d 1324, 1330 (7th Cir.1991). Just how much disclosure is required under that obligation is a question, the answer to which, as a practical matter, is supplied by the National Labor Relations Board in the elaboration (or interpretation) of the cryptic language of the Act. It is axiomatic that the Board has the prime responsibility to interpret the Act, subject only to deferential judicial review. *See Lechmere, Inc. v. NLRB*, —— U.S. ——, ——, 112 S.Ct. 841, 847, 117 L.Ed.2d 79 (1992). Therefore, in the absence of any Postal Service interpretation to the contrary, Routine Use M, on its face, contemplates that the Postal Service would comply with an NLRB determination (at least one not challenged in the court of appeals) as to material that must be disclosed to the union.

If and when an employer's obligation under section 8(a)(5) crystallizes into the form of a collective bargaining agreement, and if that agreement has a binding arbitration clause—as it usually does—the employer is not only obliged to take grievances to arbitration but also to comply with the arbitrator's award. *United Steelworkers of Am. v. American Mfg. Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). Because of the strong federal policy encouraging arbitration of collective bargaining contract disputes, the Board typically will defer to the arbitration process and the arbitrator's award when the award turns on a contractual, rather than statutory, duty, or when those duties overlap, as they apparently do here. *See Olin Corp.*, 268 N.L.R.B. 573, 574, 1984 WL 35996 (1984); *see generally NLRB v.*

---

5. The FSLMRA requires agencies to disclose data to unions "which is reasonably available and necessary for ... negotiation of subjects within the scope of collective bargaining...." 5 U.S.C. § 7114(b)(4)(B) (1988). OPM's routine use notice provided that agencies would "disclose information to officials of labor organizations ... when relevant and necessary to their duties of exclusive representation...." *See Treasury*, 884 F.2d at 1454.

6. Judge Randolph, who apparently eschews deference as a matter of principle (an unusual position for a judge on this circuit), nevertheless does not indicate why he believes the information is *not* needed for collective bargaining. I would be surprised if anyone would say the information is not relevant. I am uncertain as to the precise doctrinal basis on which Judge Williams accepts the arbitrator's interpretation.

*USPS,* 8 F.3d 832, 837 (D.C.Cir.1993). Compliance with an arbitration clause, then, can be thought to be part of the Postal Service's general obligation under the National Labor Relations Act as it is referred to in the routine use notice.[7]

We should bear in mind that the routine use exception to the Privacy Act, assuming the proposed use is compatible with the purpose for which the information is collected, is in the control of the government agency. The agency has a measure of discretion in publishing routine uses which determine whether information collected from employees is turned over to a third party. That may mean that the Postal Service has an obligation under the National Labor Relations Act to publish a routine use notice that would accommodate its duties under that Act. Indeed, the draftsmen of Routine Use M appear to have assumed that the Postal Service's obligations under the NLRA drove if it did not dictate the wording of the notice. The NLRA (and for that matter the FSLMRA), it might be said, subordinates, to some extent, the privacy interests of individual employees to the perceived common interests of a bargaining unit. Judge Randolph apparently does not share this understanding and instead takes the position that the Postal Service can freely alter its obligations under the NLRA or the contract through the form of routine uses it publishes. That would mean, presumably, that if the Postal Service revoked Routine Use M altogether it would not be obliged to provide *any* employee-specific information to the union, including individual compensation or classification data. I think the very formulation of that position suggests its weakness.

Judge Williams, on the other hand, agrees that the Postal Service could not unilaterally revoke or alter its Routine Use M to avoid its contractual obligation. And, if a contractual obligation *prevents* the Postal Service from altering a routine use notice, presumably such an obligation could also *require* the Postal Service to modify an existing (or promulgate a new) one to conform to the contract. As I understand Judge Williams, he draws a distinction between the Postal Service's obligations under the collective bargaining agreement and the NLRA. The former precludes the Postal Service publishing (or failing to publish) inconsistent routine uses but not the latter. In other words, the Postal Service, absent a collective bargaining agreement, is entirely free to abrogate its duty under the NLRA to provide employee-specific information concerning wages, hours, and working conditions to the exclusive collective bargaining representatives of those employees. I think that position is also an untenable reconciliation of the two statutes. Congress certainly never indicated when it passed the Privacy Act that the Postal Service could use it as a defensive weapon to avoid the obligation to bargain in good faith—concerning wages, hours, and working conditions of *all* employees represented by the union—that Congress imposed upon it when it placed the Postal Service under the NLRA.[8]

Although this case, as did *Treasury,* comes to us in the posture of the government agency asserting that its routine use notice should be interpreted differently than its collective bargaining agreement, the government might well have accepted the union's position that the language of both meant essentially the same. In that event, individual employees could have brought this action protesting disclosure. If the Postal Service voluntarily had disclosed the requested information to the union, it is hard to imagine that employees would have a viable claim for violation of

---

7. Under the NLRA—unlike the FSLMRA—the failure to comply with an arbitrator's award as required by a collective bargaining agreement does not constitute an unfair labor practice *per se. Compare Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 513, 82 S.Ct. 519, 526, 7 L.Ed.2d 483 (1962) (NLRA) *with Department of Health and Human Serv. v. FLRA,* 976 F.2d 1409, 1413 (D.C.Cir.1992) (FSLMRA).

8. Judge Ruth B. Ginsburg (now Justice Ginsburg) seemed to have intuitively realized that the analytic framework in which *Treasury* had been presented to the court was somehow inadequate. *See Treasury,* 884 F.2d at 1457, 1461 (Ruth B. Ginsburg, J., concurring). The FLRA did not claim that a government agency could be obliged under the FSLMRA to publish a routine use that would discharge the agency's obligations under the FSLMRA.

the Privacy Act *based on the wording of the routine use notice* even in the absence of a NLRB or arbitrator's order, so long as the Postal Service could rely on a plausible interpretation of its duties under the NLRA. And if we would not hold that if the Postal Service voluntarily disclosed this information the Privacy Act was violated, I do not see how it could be thought that the language of Routine Use M justifies the Postal Service's refusal to disclose. The standard must be the same; if the Postal Service *could* disclose the information under Routine Use M then it *must* disclose that information, because in the absence of a Privacy Act defense the arbitrator's award must be enforced.[9]

To be sure, there might be categories of information that the Postal Service could not safely disclose pursuant to its labor law obligations, but it seems likely that would have to be information that was *irrelevant* to collective bargaining or that fell within the narrow *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979), exception. *See* 440 U.S. at 318–19, 99 S.Ct. at 1133 (reversing the NLRB and holding that highly sensitive information such as employee psychological aptitude test scores did not have to be disclosed to a union under section 8(a)(5) without employee consent). But, the routine use language does not *oblige* the Postal Service to second-guess a union's *need* for information that is relevant. And in this case it is not contended that the information the union seeks is irrelevant. Nor does the Postal Service claim that a private employer would not be obliged to turn over to its union the same sort of information sought here. At the very least, then, in the absence of an official interpretation of the regulation that articulates a different standard, Routine Use M must authorize the Postal Service to disclose to the union information that either the NLRB or an arbitrator holds that the Postal Service is obliged to disclose, so long as those orders remain unchallenged. The Sixth Circuit has also, albeit implicitly,

adopted this reading. After quoting a virtually identical predecessor to the Routine Use M notice in effect in 1989, the court stated: "Therefore, it is clear that if the National Labor Relations Act requires the Postal Service to supply the desired information, the unconsented-to disclosure of such would fall within the 'routine use' exception to the Privacy Act." *NLRB v. United States Postal Serv.*, 841 F.2d 141, 145 n. 3 (6th Cir.1988).

## B.

■ I think the more difficult question presented is whether the Postal Service may turn over the information sought even if Routine Use M authorizes disclosure. The Postal Service, raising an issue not presented in *Treasury*, 884 F.2d at 1453–54, claims that the Privacy Act interposes a complete bar. As noted above, the Act defines a "routine use" to be "the use of such record for a purpose which is *compatible* with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7) (emphasis added). In common usage, the word "compatible" means simply "capable of existing together without discord or disharmony." WEBSTER'S THIRD NEW INT'L DICTIONARY, 463 (1971). Hence, so long as a proposed disclosure would not actually frustrate the purposes for which the information was gathered, that requirement would be met. Only in rare cases would disclosure run afoul of such a dictate.

However, consistent with legislative history suggesting that the term "compatible" in the routine use definition contained in 5 U.S.C. § 552a(a)(7) was added in order to *limit* interagency transfers of information, *see, e.g.*, 120 Cong.Rec. 40,881 (1974), both the Third and the Ninth Circuits have held that there must be a far tighter nexus—a nexus approaching an identity of purpose—between the reason the information was collected and the proposed routine use than the word "compatible" might imply. *See Britt v.*

---

9. The alternative view—that the scope of disclosure permissible under Routine Use M is narrower than the agency's disclosure duties under the agreement—would force the agency, whether or not it so desired, to litigate virtually every disclosure request. Only a court order would enable the agency in such a circumstance to avoid the

dilemma of choosing between compliance with a union's request (or arbitrator's order), with the attendant possibility that a court might later find a Privacy Act violation to have occurred, or to refuse to comply, thereby triggering litigation under section 301 of the LMRA. *See* 29 U.S.C. § 185.

*Naval Investigative Serv.*, 886 F.2d 544, 549–50 (3d Cir.1989) (gathering of information for purposes of criminal investigation not compatible with disclosure to government agency employer for use by employer in evaluating employee's integrity); *Swenson v. U.S. Postal Serv.*, 890 F.2d 1075, 1078 (9th Cir.1989) (holding that collection of data for purposes of adjudicating EEOC charges was not compatible with disclosure to congressmen investigating charges brought by an employee who had filed an EEO complaint that the USPS had undercounted its rural routes). As the Third Circuit stated, "[t]here must be a more concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure." *Britt*, 886 F.2d at 549–50 (citations omitted). And we have suggested, although arguably in *dicta*, that the compatibility requirement imposed by section 552a(a)(7) would preclude an agency that had gathered medical records for purposes of medical diagnosis and the processing of a "claim file" to craft a routine use notice broad enough to permit that agency to disclose those records to a grand jury investigating the claimant's allegedly fraudulent unemployment benefits collection. *Doe v. Stephens*, 851 F.2d 1457, 1467 (D.C.Cir.1988).[10]

Yet, if the interpretation of the Third and Ninth Circuits of "compatible" were to be carried over to the labor relations context, it would throw the NLRA (and the FSLMRA) hopelessly into conflict with the Privacy Act. The Privacy Act, thus construed, would forbid an agency from disclosing information pursuant to a routine use unless its purpose in disclosure would be virtually identical to its purpose in gathering the information in the first place. Because an agency can hardly be thought to maintain records *for the specific purpose* of providing that information to unions, the logic of the Third and Ninth Circuits' opinions would seem to *pro-*

*hibit* an agency from disclosing information indisputably subject to mandatory disclosure under the labor laws—such as the wage rates of individual employees—even if the agency in question wished to disclose that information and published an appropriate routine use notice describing such disclosure.[11]

Neither *Swenson* nor *Britt*, however, arose in the labor law context, and no court has been faced with the task of defining "compatibility" where other laws have pressed upon its definition. The Third Circuit itself, sitting *en banc*, while not addressing the compatibility requirement of section 552a(a)(7), approved in the labor law context the disclosure to a union of employees' home addresses under the "routine use" exception to the Privacy Act. *FLRA v. U.S. Dep't of the Navy*, 966 F.2d 747, 765 (3d Cir.1992). That decision suggests that even the Third Circuit might not view its decision in *Britt* to prevent routine use disclosures to labor organizations as part of the collective bargaining process mandated by the labor laws. Whatever the merit of the decisions of prior courts that have held "compatibility" to require more than mere "inconsistency," and that a finding of a substantial similarity of purpose might be appropriate in the non-labor law context in order to effectuate congressional intent, the compatibility requirement imposed by section 552a(a)(7) cannot be understood to prevent an agency from disclosing to a union information as part of the collective bargaining process. The labor laws, it must be remembered, impose on the employer as well as the union the obligation to facilitate the process of collective bargaining. *See, e.g.,* Labor Management Relations Act of 1947 (LMRA), § 1(b), 29 U.S.C. § 141(b) (stating Congress' declaration of purpose that "employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other"). Thus, Congress could not have viewed disclosure of information to la-

---

10. Admittedly, *Stephens* could be read more narrowly. *Stephens'* conclusion might have rested on the notion that disclosure to a grand jury of psychiatric records might chill a patient's readiness to seek psychiatric help, and thus conflict with the purposes for which the records were collected.

11. Both my colleagues presumably believe that a government agency's refusal to provide employee wage rates to a union that represented those employees as long as the agency also refused to issue a routine use notice that authorized the disclosure is defensible.

bor organizations as part of the collective bargaining process as incompatible with the agency's collection purpose.

In any event, it is not necessary to decide today the precise limitations created by section 552a(a)(7)'s compatibility requirement in the non-labor law context. I would hold only that given the policies underlying the labor laws, disclosure of records to a union as part of the collective bargaining process cannot be incompatible with the agency's purposes within the meaning of the Privacy Act.

### C.

■ It will be recalled that the Privacy Act mandates that each employee receive actual notice of the routine uses to which private information provided by the employee is put. Although the statute itself does not provide, in so many terms, that an agency's failure to provide employees with actual notice of its routine uses would prevent a disclosure from qualifying as a "routine use," that conclusion seems implicit in the structure and purpose of the Act, as the Ninth Circuit has held, and as the union concedes. *Covert v. Harrington,* 876 F.2d 751, 755–56 (9th Cir.1989). Such notice must be provided either on the form with which the information is gathered, or on another form that may be retained by the employee. *See* 5 U.S.C. § 552a(e)(3)(C); *Covert,* 876 F.2d at 755–756. The Postal Service argues that its employees never received actual notice, consistent with this subsection, of the proposed use to which these employees' handicap status, life insurance election, and the three thrift savings codes would be put. The union can point only to USPS manuals directing, in general terms, USPS officials to advise employees about routine disclosures "for collective bargaining purposes" of information gathered by such officials, and to such specific directives relating to "restricted medical information." With the possible exception of handicap status, the union produces no specific forms

upon which the notice required by section 552a(e)(3)(C) was provided, but asks us instead to infer from the USPS' *general policies* that actual written notice to employees was in fact provided.

The question of whether the USPS provided its employees with actual notice of the routine use to which the employees' handicap, life insurance, and thrift plan codes would be put on forms that comply with section 552a(e)(3)(C) presents issues of fact. The district court made no findings of fact regarding this issue so we will remand the case for it to resolve that dispute in the first instance.[12]

\*   \*   \*   \*   \*   \*

Accordingly, the judgment of the district court is reversed and this case remanded for further proceedings consistent with this opinion.

SO ORDERED.

STEPHEN F. WILLIAMS, Circuit Judge, concurring in part and concurring in the judgment:

I agree with Judge Silberman about the proper disposition of this case, and I join Part II(C) of his opinion (with the exception of the last two sentences of footnote 12). But I write separately because I find the rest of his opinion unnecessarily broad.

Aside from the actual-notice issue dealt with in Part II(C), this case presents two simple questions. First, does the Postal Service's "Routine Use M" cover the information that the arbitrator has ordered the Service to provide the union? Second, assuming that Routine Use M *does* cover that information, would the purpose of disclosure here be "compatible" with the purpose for which the information was collected, as required by 5 U.S.C. § 552a(7)?

Taking the second question first, I see no *conflict* between the purposes for which the

---

**12.** The actual notice required by section 552a(e)(3)(C) must be provided to employees at the time the information is collected. Thus, even if the union had argued—which it has not—that the Postal Service is obliged, under labor law, to provide such notice pursuant to the collective bargaining agreement, that notice could not ap- ply to the past collection of data under the Privacy Act. This is, however, not to rule out the possibility that an arbitrator, or court, could order an agency to re-collect the information at issue from its employees, giving the appropriate actual notice. The union did not raise this argument.

information was collected and those for which it will be disclosed. For me, that answers the second question. Assuming Congress meant what it said when it chose the word "compatible" rather than "congruent" or "parallel" or "related", it required no more.[1] This understanding of compatibility is, I think, in accord with our decision in *Doe v. Stephens*, 851 F.2d 1457 (D.C.Cir.1988), where we found that disclosure of psychiatric records to a grand jury was not compatible with the diagnostic purposes for which they were collected; the chilling effect of disclosure is plain. Cf. Op. of Silberman, J., *supra* at 145 n. 10. Judge Randolph apparently favors a stiffer compatibility requirement, see Op. of Randolph, J., *infra* at 149, but in my view the Privacy Act's primary check on routine uses stems instead from the requirement that agencies can invoke a routine use only if it has been tested by public notice, see 5 U.S.C. § 552a(e)(4)(D), and only if the person who provided the information in question was informed that such a use might be made of it, see 5 U.S.C. § 552a(e)(3)(C).

Turning to the other question: If the Postal Service had provided an authoritative (and reasonable) interpretation of Routine Use M, we would be obliged to defer to it. *FLRA v. United States Dep't of the Treasury*, 884 F.2d 1446, 1454 (D.C.Cir.1989). But as Judge Silberman explains, the Service has provided no authoritative interpretation at all. See Op. of Silberman, J., *supra* at 141–42. Accordingly, we must construe it ourselves in accordance with its language and the purpose expressed in that language.

The language of Routine Use M dovetails with the relevant passage of the Postal Service's collective-bargaining agreement. The first calls for disclosure of records "needed" by a union for collective bargaining, the second for disclosure of records "necessary" for that purpose. Given this apparent harmony, I believe it proper to read the routine use notice as encompassing the disclosures that the arbitrator found required by the collective bargaining agreement—in a ruling that

the Postal Service does not claim to be legally challengeable.

We could, of course, construe Routine Use M independently of the arbitrator's decision, as Judge Randolph urges in dissent. But to do so would produce a system of double vetoes (both court and arbitrator being able to block disclosure), where the controlling documents suggest that the parties intended a more harmonious and simple process.

If the Privacy Act imposes no bar, the Postal Service's contract with the union requires it to disclose the information covered by the arbitrator's award. The conclusion that Routine Use M covers this information therefore resolves the case. I see no reason to speculate about whether the Postal Service's obligations under the NLRA, or under an arbitrator's interpretation of its collective bargaining agreement, *require* the Service to have such a broad routine-use notice, much less empower the courts to compel the Service to re-collect the data from its employees under appropriate notice. Cf. Op. of Silberman, J., at 142–43, 146 n. 12. This case does not present that question, and the parties have not addressed it.

Lest Judge Silberman's hypotheses be taken as the final word, however, I note that they are not self-evidently true. The NLRA applies to the Postal Service only "to the extent not inconsistent with" the Privacy Act. 39 U.S.C. § 1209(a); 39 U.S.C. § 410(b)(1). To be sure, if the Service contracted with its unions to disclose certain information and then intentionally amended its routine-use notices to prevent itself from complying with this agreement, a court might find that the Service had not bargained in good faith and deserved appropriate sanctions. But Judge Silberman goes further. He suggests that the NLRA obliges the Postal Service to publish routine-use notices that permit it to disclose, without violating the Privacy Act, the same information that the NLRA requires private employers to disclose—even when the Service has *not* contracted to disclose this information. Likewise, he speculates that if the Service inadvertently fails to pro-

---

1. I do not share Judge Silberman's belief that the meaning of "compatible" in § 552a(7) may depend on the identity of the entity to which information is being disclosed. Cf. Op. of Silberman, J., *supra* at 145.

148

vide the actual notice required by 5 U.S.C.
§ 552a(e)(3)(C) on (or with) the forms on
which it collects such information, the NLRA
might require the Service to re-collect the
information with suitable notice to employ-
ees, so that it could be disclosed without
violating the Privacy Act. While I take no
position on these questions (since they are
not before us), it is not clear to me that the
statutory scheme compels this result. Cf.
*Local 2047, American Fed'n of Gov't Em-
ployees v. Defense General Supply Center,*
423 F.Supp. 481 (E.D.Va.1976), *aff'd per cu-
riam,* 573 F.2d 184 (4th Cir.1978) (holding
that federal agency was not required to pub-
lish routine-use notice that would have al-
lowed it to continue disclosing information to
union, even though it had agreed to disclose
that information under a collective-bargain-
ing agreement signed before the Privacy
Act's enactment); *Detroit Edison Co. v.
NLRB,* 440 U.S. 301, 318–19 n. 16, 99 S.Ct.
1123, 1133 n. 16, 59 L.Ed.2d 333 (1979) (cit-
ing *Local 2047* as example of Privacy Act's
strength).

RANDOLPH, Circuit Judge, dissenting:

"Ask, and ye shall receive," so long as ye
happen to be the National Association of
Letter Carriers asking for information about
the private lives of 240,000 Postal Service
employees, 60,000 of whom are not even un-
ion members. No matter that the Letter
Carriers utterly failed to show even the
slightest need for this sensitive data. What-
ever the union wants the union gets. It is no
small wonder that my colleagues sustain this
wholesale invasion of privacy on the basis of
a regulation issued under—of all things—the
Privacy Act, 5 U.S.C. § 552a(b).

In a complicated explanation, Judge Silber-
man deems it all important that the National
Labor Relations Act, 29 U.S.C. § 151 *et seq.,*
governs the Postal Service's labor-manage-
ment relations. It is fair to ask what this
has to do with the Privacy Act. The Nation-
al Labor Relations Act governs, to be sure,
but only "to the extent not inconsistent with
provisions of [title 39]," 39 U.S.C. § 1209(a).
And one of those title 39 provisions renders
the Postal Service subject to the Privacy Act.
39 U.S.C. § 410(b)(1). Regardless of what

the union demands, or what collective bar-
gaining entails, the Postal Service remains
subject to the Privacy Act to the same extent
as other federal agencies. National Labor
Relations Act or not, the Postal Service can-
not enter into agreements requiring it to
violate the Privacy Act. *See Local 2047, Am.
Fed'n of Gov't Employees,* 573 F.2d 184, 186
(4th Cir.1978); *Andrews v. Veterans Admin.,*
613 F.Supp. 1404, 1413 (D.Wyo.1985).

"No agency," the Privacy Act proclaims,
"shall disclose any record which is contained
in a system of records by any means of
communication to any person, or to another
agency, except pursuant to a written request
by, or with the prior written consent of, the
individual to whom the record pertains...."
5 U.S.C. § 552a(b). To this there is an ex-
ception for "routine" uses, 5 U.S.C.
§ 552a(b)(3), that is, a use "compatible with
the purposes for which [the information] is
collected" (5 U.S.C. § 552a(a)(7)) and within
the terms of a notice in the Federal Register
describing the use and its purpose, 5 U.S.C.
§ 552a(e)(4)(D). The Postal Service's Rou-
tine Use M states:

Pursuant to the National Labor Relations
Act, records from this system may be fur-
nished to a labor organization when need-
ed by that organization to perform proper-
ly its duties as collective bargaining repre-
sentative of postal employees in an appro-
priate bargaining unit.

54 Fed.Reg. 43,655 (1989).

The Postal Service interposed the Privacy
Act as its reason for refusing to comply with
the arbitrator's ruling described in Judge
Silberman's opinion. The Privacy Act would
stand in the way unless Routine Use M
validly permitted disclosure. Routine Use M
is a federal regulation promulgated under a
federal statute. As with any other provision
of federal law, the court had a duty to inter-
pret it. The principal question for the court
was: "What does this regulation mean?"
Judge Silberman sets out to answer this
question, not by interpreting Routine Use M,
but by looking about to see if someone else
had already performed the task. This mode
of decision-making is doubtless born of habit.
Rather than parse the language of a statute
or a regulation, it is easier to bestow judicial

deference on another's interpretation. Unfortunately, my colleague returns empty-handed from his search for an official Postal Service construction of Routine Use M. So he gives his blessing to the view of an arbitrator, who said the union gets whatever it wants. "The decision as to what data is needed to prepare the Union's bargaining proposals," the arbitrator wrote, "is one that only the Union can make. If it asserts that it needs this data for that purpose, and there is no reason to conclude that the assertion is not truthful, that is enough to satisfy the mandate of [the collective bargaining agreement.]"

Put aside the fact that the arbitrator did not construe the Routine Use M regulation, indeed did not even purport to do so. Forget that the arbitrator said not a word about the Privacy Act or the protection of employee privacy. Ignore that if the arbitrator thought for a moment he was doing anything more than construing a contract, he might have taken other considerations into account. Disregard our decision in *FLRA v. United States Dep't of the Treasury*, 884 F.2d 1446, 1456 (D.C.Cir.1989), *cert. denied*, 493 U.S. 1055, 110 S.Ct. 863, 864, 107 L.Ed.2d 947, 948 (1990), refusing to defer even to the Federal Labor Relations Authority's interpretation of an agency's routine use regulation. Overlook all these defects in my colleagues' analyses, and accept their fictional account of what the Postal Service agreed to with respect to the Privacy Act when it entered into the contract. Judge Silberman's op. at 142–43; Judge Williams' op. at 147. Assume, in other words, that my colleagues rightly read Routine Use M to mean exactly what the arbitrator said the contractual provision means. The consequence is that an independent entity of the federal government has ceded—lock, stock and barrel—its statutory responsibility under the Privacy Act to preserve the confidentiality of records pertaining to individuals. And it has ceded this responsibility to a third party, the union, who may obtain this private data for any reason or no reason, and use it for whatever purposes it deems fit.

If this is the meaning of Routine Use M, and my colleagues say it is, then in my view the Postal Service has violated the Privacy Act, or more accurately, has exceeded its authority to promulgate routine use regulations under the Act. The Privacy Act is supposed to ensure that individual rights are at least considered and weighed whenever an agency uses or disseminates information. *Doe v. DiGenova*, 779 F.2d 74, 84 (D.C.Cir. 1985). If an individual's interest in maintaining his or her privacy can be cast aside just because someone wants to know where they live, or how old they are, or if they suffer from any handicaps, or if they are saving money, then the Privacy Act stands for nothing. No agency may promulgate a routine use regulation "to circumvent the mandates of the Privacy Act." *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C.Cir.1988). Agencies must narrowly define routine uses to "permit disclosure only when justified by a substantial public interest." *Andrews*, 613 F.Supp. at 1413. Yet as my colleagues have defined Routine Use M, it serves no "public interest," let alone a substantial one. There is "no principle of national labor policy," the Supreme Court held in *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 315, 99 S.Ct. 1123, 1131, 59 L.Ed.2d 333 (1979), that entitles a union, merely upon demand, to obtain confidential information about employees from an employer. And there is certainly no principle derived from the Privacy Act that would tolerate anything of the sort. *See Treasury*, 884 F.2d at 1457 (R.B. Ginsburg, J., concurring).

Of course the Postal Service's regulation cannot possibly mean what my colleagues say. The meaning of Routine Use M is no great mystery. The Supreme Court used almost the same words in the opening sentence of *Detroit Edison*: "The duty to bargain collectively, imposed upon an employer by § 8(a)(5) of the National Labor Relations Act, includes a duty to provide relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative." 440 U.S. at 303, 99 S.Ct. at 1125. The Court then explained the import of those words. Unlike the arbitrator's decision on which my colleagues rely, *Detroit Edison* establishes that a union's need and a union's want are not the same. "A union's bare assertion that it

needs the information" is not enough; and its status as the collective bargaining agent does not, in itself, entitle the union to pry into the private lives of those it represents. *Id.* at 314, 99 S.Ct. at 1131; *Andrews,* 613 F.Supp. at 1413. To receive private information about employees, the union must demonstrate a particularized need, related to its collective bargaining responsibilities. *Detroit Edison,* 440 U.S. at 314–15, 99 S.Ct. at 1131; *see also NLRB v. Truitt Mfg. Co.,* 351 U.S. 149, 153–54, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956); *NLRB v. FLRA,* 952 F.2d 523, 531 (D.C.Cir.1992). Even then, legitimate interests in confidentiality must be respected by tailoring the form of the disclosure. *Detroit Edison,* 440 U.S. at 318–19, 99 S.Ct. at 1133.

In *FLRA v. Treasury* we interpreted another agency's routine use regulation nearly identical to the Postal Service's. Our decision was much the same as the Supreme Court's in *Detroit Edison.* A reasonable interpretation of the regulation, we held, was one embraced by the agency: private information is not necessary to a union's collective bargaining duties if the union has alternate means of accomplishing its goals. *Treasury,* 884 F.2d at 1456.

Given a choice between, on the one hand, *Detroit Edison* and *FLRA v. Treasury,* and, on the other hand, the arbitrator's ruling in this case, my colleagues decide to go with the arbitrator. I prefer the reasoning of the Supreme Court and the D.C. Circuit. Under *Detroit Edison* and *Treasury,* the union's request should be rejected. The union has steadfastly refused to establish its need for this data and it has flatly rejected the Postal Service's offer of a reasonable alternative. I therefore respectfully dissent.