13-803-cr
*United States v. Zhyltsou*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2013

(Argued: March 24, 2014            Decided: October 3, 2014)

No. 13-803-cr

_____

UNITED STATES OF AMERICA,
*Appellee*,

- v. -

SEMYON VAYNER, AKA SAM VAYNER, AKA SEMEN,
*Defendant*,

ALIAKSANDR ZHYLTSOU,
*Defendant-Appellant*.

_____

Before:      WESLEY, LIVINGSTON, and LOHIER, *Circuit Judges*.

Appeal from a judgment of conviction of the United States District Court for the Eastern District of New York (Glasser, *J.*), following a jury verdict finding Defendant-Appellant Aliaksandr Zhyltsou guilty of the unlawful transfer of a false identification document.  We conclude that the district court erred in permitting the introduction of a Russian social media page that the government told the jury was created by Zhyltsou, without satisfying the authentication requirement of Rule 901 of the Federal Rules of Evidence.  Because this evidentiary ruling was an abuse of the district court's discretion and also was not harmless, we **VACATE** the conviction and **REMAND** the case for a new trial.

TALI FARHADIAN (Jo Ann M. Navickas, *on the brief*), Assistant United States Attorneys, *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee*.

YUANCHUNG LEE, Assistant Federal Public Defender, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellant*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

In Defendant-Appellant Aliaksandr Zhyltsou's criminal trial on a single charge of transfer of a false identification document, the government offered into evidence a printed copy of a web page, which it claimed was Zhyltsou's profile page from a Russian social networking site akin to Facebook. The district court (Glasser, *J.*) admitted the printout over Zhyltsou's objection that the page had not been properly authenticated under Rule 901 of the Federal Rules of Evidence. We conclude that the district court erred in admitting the web page evidence because the government presented insufficient evidence that the page was what the government claimed it to be – that is, *Zhyltsou's* profile page, as opposed to a profile page on the Internet that Zhyltsou did not create or control. Because the district court abused its discretion in admitting the evidence, and because this error was not harmless, we vacate the conviction and remand for retrial.

2

## BACKGROUND

Aliaksandr Zhyltsou was convicted after trial on a single count of the unlawful transfer of a false identification document, in violation of 18 U.S.C. § 1028(a)(2) and (b)(1)(A)(ii). At trial, the government's principal evidence against Zhyltsou was the testimony of Vladyslav Timku, a Ukrainian citizen residing in Brooklyn who testified pursuant to a cooperation agreement and who had earlier pled guilty to conspiracy to commit wire fraud, aggravated identity theft, and impersonating a diplomat. Timku testified that he was a friend of Zhyltsou's and was familiar with Zhyltsou's work as a forger because he had previously paid Zhyltsou to create false diplomatic identification documents in a scheme to avoid taxes on the purchase and resale of luxury automobiles through a corporation called Martex International. Timku said that in the summer of 2009 he asked Zhyltsou to create a forged birth certificate that would reflect that Timku was the father of an invented infant daughter. Timku sought the birth certificate in an attempt to avoid compulsory military service in his native Ukraine, which permits a deferment of service for the parents of children under three years of age. According to Timku, Zhyltsou agreed to forge the birth certificate without charge, as a "favor," and began creating the fake birth certificate on a computer while the pair chatted in a Brooklyn

3

Internet café. Timku testified that Zhyltsou sent the completed forgery to Timku via e-mail on August 27, 2009 from azmadeuz@gmail.com (the "Gmail address"), an e-mail address that Timku had often used to correspond with Zhyltsou. After receiving the document, Timku thanked Zhyltsou and then went on to use the fake document to receive the deferment from military service that he sought. The government introduced a copy of the e-mail, with the forged birth certificate as an attachment, which reflected that it was sent to Timku's e-mail address, "timkuvlad@yahoo.com," from azmadeuz@gmail.com.

The government presented several other witnesses who corroborated certain aspects of Timku's testimony – regarding the falsity of the birth certificate, the Ukrainian military deferment for parents of young children, and the path of the e-mail in question through servers in California. There was expert testimony to the effect that the e-mail originated in New York, but no evidence as to what computer it was sent from, or what IP addresses were linked to it. Thus, near the conclusion of the prosecution's case, only Timku's testimony directly connected Zhyltsou with the Gmail address that was used to transmit the fake birth certificate to Timku.[1]

_____

[1] The government did introduce evidence showing that the azmadeuz@gmail.com account was closed two days after Zhyltsou had an encounter with federal agents. In summation, the government argued that the closure circumstantially supported the theory that Zhyltsou was the owner of the account. However, federal agents were questioning

Before the prosecution rested, however, the government indicated to the district court that it planned to call an unexpected final witness: Robert Cline, a Special Agent with the State Department's Diplomatic Security Service ("DSS"). The government said that it intended to introduce a printout of a web page that the government claimed to be Zhyltsou's profile on VK.com ("VK"), which Special Agent Cline described as "the Russian equivalent of Facebook." J.A. 36. Zhyltsou objected, contending that the page had not been properly authenticated and was thus inadmissible under Federal Rule of Evidence 901.[2] The district court overruled

Timku that day regarding other criminal charges. (Zhyltsou happened to be present and was himself questioned only briefly.) The defense intimated in its summation that Timku would also have had reason to delete the account at that time.

[2] Zhyltsou also objected to the district court's admission of the VK page on the ground that it was not disclosed to him before trial in violation of Rule 16 of the Federal Rules of Criminal Procedure. Rule 16 provides grounds for reversal if the "government's untimely disclosure of the evidence" caused the defendant "substantial prejudice." *United States v. Salameh*, 152 F.3d 88, 130 (2d Cir. 1998) (per curiam) (internal quotation marks omitted). Zhyltsou argued that the page was not provided to him before trial and that he was prejudiced due to his inability to conduct forensic analysis in an attempt to discover the source of the information on the VK page. We incline to agree with Zhyltsou that the late disclosure may have "adversely affected some aspect of his trial strategy," *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997) (internal quotation mark omitted), because his counsel argued in his opening statement – based on the evidence provided in discovery by the government at that time – that there was no evidence corroborating Timku's testimony that the Gmail address belonged to Zhyltsou. Because we vacate Zhyltsou's conviction on other grounds, however, we need not reach the issue of whether the timing of the disclosure caused him substantial prejudice. For the same reason, we also need not reach Zhyltsou's additional argument that his conviction must be vacated due to error in the district court's supplemental instruction in response to a jury question.

5

the defense objection, concluding that the VK page was "[Zhyltsou's] Facebook page. The information on there, I think it's fair to assume, is information which was provided by him." J.A. 32. Moreover, the court ruled, "There's no question about the authenticity of th[e] document so far as it's coming off the Internet now." J.A. 32.

During his testimony, Special Agent Cline identified the printout as being from "the Russian equivalent of Facebook." He noted to the jury that the page purported to be the profile of "Alexander Zhiltsov" (an alternate spelling of Zhyltsou's name), and that it contained a photograph of Zhyltsou. Importantly for the government's case, Special Agent Cline next pointed out that under the heading, "Contact Information," the profile listed "Azmadeuz" as "Zhiltsov's" address on Skype (a service that Special Agent Cline described as a "voiceover IP provider"). The web page also reflected that "Zhiltsov" worked at a company called "Martex International" and at an Internet café called "Cyber Heaven," which corresponded with Timku's earlier testimony that Zhyltsou and Timku had both worked for those entities. On cross-examination, Special Agent Cline admitted that he had only a "cursory familiarity" with VK, had never used the site except to view this single page, and did not know whether any identity verification was required in order for

6

a user to create an account on the site. In its summation, the government argued that it had proven that Zhyltsou had produced the fake birth certificate and sent it to Timku using the Gmail address. In the final words of her summation, the Assistant United States Attorney ("AUSA") argued that proof of the connection between Zhyltsou and the Gmail address could be found on Zhyltsou's "own Russian Facebook page":

> It has the defendant's profile picture on it. You'll see that it confirms other facts that you've learned about the defendant. That he worked at Martex and at Cyber Heaven, for example. He told [a DSS agent] that he's from Belarus. This page says he's from Minsk, the capital of Belarus. And on that page, you'll see the name he uses on Skype which, like e-mail, is a way to correspond with people over the Internet.
>
> Azmadeuz. That [is] his online identity, ladies and gentlemen, for Skype and for [G]mail. That is [w]hat the defendant calls himself. Timku even told you that the defendant sometimes uses azmadeuz@yahoo.com. That [is] his own name on the Internet. Timku didn't make it up for him. The defendant made it up for himself.
>
> Aliaksandr Zhyltsou made a fake birth certificate and he sent it through e-mail. Those are the facts. The defendant is guilty. Find him so. Thank you.

G.A. 65-66.

After deliberating for approximately a day and a half, the jury found Zhyltsou guilty on the single charge contained in the indictment. Subsequently, the district court sentenced Zhyltsou principally to time served and one year of post-release

7

supervision.[3]  Judgment was entered in March 2013, and Zhyltsou brought this timely appeal.

## DISCUSSION

The preliminary decision regarding authentication is committed to the district court, *United States v. Sliker*, 751 F.2d 477, 499 (2d Cir. 1984), and we review that decision for abuse of discretion, *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001).  "A district court abuses its discretion when it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or renders a decision that cannot be located within the range of permissible decisions."  *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (brackets and internal quotation marks omitted).

### I.

"The requirement of authentication is . . . a condition precedent to admitting evidence."  *Sliker*, 751 F.2d at 497; *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990) ("In general, a document may not be admitted into evidence unless it is shown to be genuine.").  Rule 901 of the Federal Rules of Evidence governs the authentication of evidence and provides, in pertinent part: "To satisfy

[3] Zhyltsou was denied bail pending trial; all told, he spent approximately one year in detention.

8

the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).[4] "This requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (internal quotation marks omitted). The ultimate determination as to whether the evidence is, in fact, what its proponent claims is thereafter a matter for the jury. *See Sliker*, 751 F.2d at 499.

Rule 901 "does not definitively establish the nature or quantum of proof that is required" preliminarily to authenticate an item of evidence. *Id.* at 499. "The type and quantum of evidence" required is "related to the purpose for which the evidence is offered," *id.* at 488, and depends upon a context-specific determination whether the proof advanced is sufficient to support a finding that the item in question is what its proponent claims it to be. We have said that "[t]he bar for authentication of evidence is not particularly high." *United States v. Gagliardi*, 506

---

[4] We note that Rule 902 provides for several classes of "self-authenticating" evidence – that is, evidence "requir[ing] no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid. 902. None of the categories enumerated in the rule (which include, *inter alia*, certain public records, periodicals, or business records) applies to the VK page.

F.3d 140, 151 (2d Cir. 2007). But even though "[t]he proponent need not rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be," *id.* (internal quotation marks omitted), there must nonetheless be at least "sufficient proof . . . so that a reasonable juror could find in favor of authenticity or identification," *Pluta*, 176 F.3d at 49 (internal quotation marks omitted).

The "proof of authentication may be direct or circumstantial." *United States v. Al-Moayad*, 545 F.3d 139, 172 (2d Cir. 2008). The simplest (and likely most common) form of authentication is through "the testimony of a 'witness with knowledge' that 'a matter is what it is claimed to be.'" *United States v. Rommy*, 506 F.3d 108, 138 (2d Cir. 2007) (quoting Fed. R. Evid. 901(b)(1) (pre-2011 amendments)). This is by no means exclusive, however: Rule 901 provides several examples of proper authentication techniques in different contexts, *see* Fed. R. Evid. 901(b), and the advisory committee's note states that these are "not intended as an exclusive enumeration of allowable methods but are meant to guide and suggest, leaving room for growth and development in this area of the law," Fed. R. Evid. 901 advisory committee's note (Note to Subdivision (b)).

Some examples illustrate the point. For instance, we have said that a document can be authenticated by "distinctive characteristics of the document itself, such as its '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances.'" *Maldonado-Rivera*, 922 F.2d at 957 (alteration in original) (quoting Fed. R. Evid. 901(b)(4) (pre-2011 amendments)); *see also Sliker*, 751 F.2d at 488 (contents of alleged bank records, in conjunction with their seizure at purported bank office, provided sufficient proof of their connection to allegedly sham bank). Or, where the evidence in question is a recorded call, we have said that "[w]hile a mere assertion of identity by a person talking on the telephone is not in itself sufficient to authenticate that person's identity, some additional evidence, which need not fall into any set pattern, may provide the necessary foundation." *Dhinsa*, 243 F.3d at 658-59 (brackets and internal quotation marks omitted); *see also Sliker*, 751 F.2d at 499 (voice on tape recording was sufficiently authenticated as defendant's based on comparison of taped voice with defendant's trial testimony). And in a case where credit card receipts purportedly signed by the defendant would have tended to support his alibi defense, we ruled that the defendant's copies had been sufficiently authenticated, despite some question as to when these copies had been signed, where the defendant offered

11

testimony from store managers as to how the receipts were produced, testimony from the defendant's wife (a joint holder of the credit card) that she had not made the purchases in question, and testimony from a handwriting expert that the defendant's signature was genuine. *United States v. Tin Yat Chin*, 371 F.3d 31, 35-38 (2d Cir. 2004).[5]

As we have said, "[a]uthentication of course merely renders [evidence] admissible, leaving the issue of [its] ultimate reliability to the jury." *United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001). Thus, after the proponent of the evidence has adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be, the opposing party "remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the *weight* of the evidence – not to its *admissibility*." *Tin Yat Chin*, 371 F.3d at 38.

---

[5] Some courts have suggested applying "greater scrutiny" or particularized methods for the authentication of evidence derived from the Internet due to a "heightened possibility for manipulation." *Griffin v. State*, 19 A.3d 415, 424 (Md. 2011) (citing cases). Although we are skeptical that such scrutiny is required, we need not address the issue as the government's proffered authentication in this case fails under Rule 901's general authentication requirement.

II.

Based on these principles, we conclude that the district court abused its discretion in admitting the VK web page, as it did so without proper authentication under Rule 901. The government did not provide a sufficient basis on which to conclude that the proffered printout was what the government claimed it to be – *Zhyltsou's* profile page – and there was thus insufficient evidence to authenticate the VK page and to permit its consideration by the jury.

In the district court, the government initially advanced the argument that it offered the evidence simply as a web page that existed on the Internet at the time of trial, not as evidence of Zhyltsou's own statements. The prosecution first represented to the district court that it was presenting the VK page only as "what [Special Agent Cline] is observing today on the Internet, just today," J.A. 26, conceded that "the agent does not know who created it," and averred that Special Agent Cline would testify only that "he saw [the VK page] and this is what it says," J.A. 30. Consistent with these representations, Special Agent Cline testified only that the page containing information related to Zhyltsou was presently accessible on the Internet and provided no extrinsic information showing that Zhyltsou was the

13

page's author or otherwise tying the page to Zhyltsou.[6]

At other times, however, the government repeatedly made a contrary argument to both the trial court and the jury, and insisted that the page belonged to and was authored by Zhyltsou.[7]  Nor is this surprising.  The VK profile page was helpful to the government's case only if it belonged to Zhyltsou – if it was his profile page, created by him or someone acting on his behalf – and thus tended to establish that Zhyltsou used the moniker "Azmadeuz" on Skype and was likely also to have used it for the Gmail address from which the forged birth certificate was sent, just as Timku claimed.  Moreover, the district court overruled Zhyltsou's hearsay objection and admitted a printout of the profile page, which stated that "Zhiltsov's" Skype username was "Azmadeuz," because it found that the page was created by

---

[6] Certain statements by the district court could also support this view of the government's theory of the introduction of the VK page – notably, the district court's suggestion that the page was properly authenticated solely by the fact that it was "coming off the Internet now."  J.A. 32.  As noted below, however, this rationale for authentication is inconsistent with the manner in which the evidence was admitted by the district court and the way it was employed by the government at trial.

[7] *See* J.A. 21 (AUSA to the  district court: "This is the defendant's Russian Facebook page. . . .  [It] contains his Skype address which is the same formulation ["]azmadeuz["] next to his photograph."); G.A. 66 (AUSA in summation to the jury: "Azmadeuz.  That [is] his online identity, ladies and gentlemen, for Skype and for [G]mail.  That is [w]hat the defendant calls himself.  Timku even told you that the defendant sometimes uses azmadeuz@yahoo.com.  That [is] his own name on the Internet. Timku didn't make it up for him.  The defendant made it up for himself.")

Zhyltsou, and the statement therefore constituted a party admission. *See* J.A. 23 (The Court: "This is a statement made by your client. This is his Facebook record."); J.A. 29-30 (describing the government's plan to establish that the Gmail address was Zhyltsou's "by what [the court] regard[ed] to be perfectly legitimate admissible evidence of what it is, the assumption is quite clear that what appears on the Facebook page is information which was provided by" Zhyltsou); J.A. 32 (The Court: "It's his Facebook page. The information on there, I think it's fair to assume, is information which was provided by him."); *see also* Fed. R. Evid. 801(d)(2)(A) (defining an opposing party's statement as non-hearsay).

As noted above, Rule 901 requires "evidence sufficient to support a finding that the item is what the proponent claims it is." It is uncontroverted that information *about* Zhyltsou appeared on the VK page: his name, photograph, and some details about his life consistent with Timku's testimony about him. But there was no evidence that Zhyltsou himself had created the page or was responsible for its contents. Had the government sought to introduce, for instance, a flyer found on the street that contained Zhyltsou's Skype address and was purportedly written or authorized by him, the district court surely would have required some evidence that the flyer did, in fact, emanate from Zhyltsou. Otherwise, how could the statements

15

in the flyer be attributed to him? *Cf. Dhinsa*, 243 F.3d at 658-59 ("[A] mere assertion of identity by a person talking on the telephone is not in itself sufficient to authenticate that person's identity . . . ."). And contrary to the government's argument, the mere fact that a page with Zhyltsou's name and photograph happened to exist on the Internet at the time of Special Agent Cline's testimony does not permit a reasonable conclusion that this page was created by the defendant or on his behalf.

It is true that the contents or "distinctive characteristics" of a document can sometimes alone provide circumstantial evidence sufficient for authentication. Fed R. Evid. 901(b)(4). But this method is generally proper when the document "deals with a matter sufficiently obscure . . . so that the contents of the writing were not a matter of common knowledge." *Maldonado-Rivera*, 922 F.2d at 957 (brackets and internal quotation marks omitted). Here, the information contained on the VK page was general, and it was also known by Timku and likely others, some of whom may have had reasons to create a profile page falsely attributed to the defendant. Other than the page itself, moreover, no evidence in the record suggested that Zhyltsou even had a VK profile page, much less that the page in question was that page. Nor was there any evidence that identity verification is necessary to create such a page

16

with VK, which might also have helped render more than speculative the conclusion that the page in question belonged to Zhyltsou.

We express no view on what kind of evidence *would* have been sufficient to authenticate the VK page and warrant its consideration by the jury. Evidence may be authenticated in many ways, and as with any piece of evidence whose authenticity is in question, the "type and quantum" of evidence necessary to authenticate a web page will always depend on context. *Sliker*, 751 F.2d at 488. Given the purpose for which the web page in this case was introduced, however – to support the inference that it was Zhyltsou who used the moniker "azmadeuz" for the Gmail address from which the forged birth certificate was sent – Rule 901 required that there be *some* basis on which a reasonable juror could conclude that the page in question was not just any Internet page, but in fact *Zhyltsou's* profile. No such showing was made and the evidence should therefore have been excluded.

III.

An erroneous evidentiary decision that has no constitutional dimension is reviewed for harmless error. *United States v. Dukagjini*, 326 F.3d 45, 61-62 (2d Cir. 2003). "A district court's erroneous admission of evidence is harmless if the appellate court can conclude with fair assurance that the evidence did not

17

substantially influence the jury." *Al-Moayad*, 545 F.3d at 164 (internal quotation marks omitted). "In order to uphold a verdict in the face of an evidentiary error, it must be 'highly probable' that the error did not affect the verdict." *Dukagjini*, 326 F.3d at 61 (quoting *United States v. Forrester*, 60 F.3d 52, 64 (2d Cir. 1995)); *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (holding that error is not harmless if the court "cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error"); *United States v. Kaplan*, 490 F.3d 110, 123 (2d Cir. 2007) (stating that an error "is harmless if we can conclude that [the evidence] was unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (internal quotation marks omitted)). In conducting the harmlessness analysis, we consider:

> (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted evidence; and (4) whether such evidence was cumulative of other properly admitted evidence.

*United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009) (brackets and internal quotation marks omitted). "We have frequently stated that the strength of the government's case is the most critical factor in assessing whether error was harmless." *United States v. Ramirez*, 609 F.3d 495, 501 (2d Cir. 2010).

18

It was, of course, vital to the government's case to prove that it was in fact Zhyltsou who used the Gmail address to send the fake birth certificate to Timku. This was the only point truly in contention at trial. Further, the prosecution's case on this point was far from overwhelming: with the limited exception of the circumstantial evidence that the Gmail account was closed shortly after Zhyltsou encountered federal agents, the *only* evidence that connected Zhyltsou to the e-mailed birth certificate, other than the VK page, was Timku's testimony.[8]

The jury may well have been reluctant to rely on Timku's testimony alone. Pursuant to his cooperation agreement, Timku pled guilty to three felonies – aggravated identity theft, impersonating a diplomat, and conspiracy to commit wire fraud – each of which involved deceit. Timku's business operation, which he said he carried on with Zhyltsou's help, involved using fake identification papers and shell companies to commit tax fraud in the course of exporting luxury vehicles for

[8] While the government presented several witnesses to bolster other parts of Timku's testimony, none presented any evidence that Zhyltsou had sent the birth certificate. Those witnesses testified, respectively, (1) that the invented infant's birth certificate was in fact a forgery; (2) that Ukraine imposes compulsive military service that permits certain exemptions, including for those with children under three years of age; (3) that the e-mail with the birth certificate attached did in fact travel from azmadeuz@gmail.com to Timku's e-mail address; and (4) that in 2011 Zhyltsou had been briefly stopped and questioned by federal agents, shortly after which (5) the Gmail account that was used to send the birth certificate was closed.

19

sale in Ukraine and Russia. Timku admitted that he had destroyed evidence and fled the country after federal agents questioned him concerning this scheme. He also testified that he paid a United States citizen to enter into a sham marriage with him and opened a joint bank account in their names with the intention of deceiving immigration authorities into thinking that the marriage was genuine. All this likely undermined Timku's credibility, and may even have led the jury to believe that Timku could have used his expertise in fabricating identities and documents to create false evidence to substantiate his testimony against Zhyltsou.

Moreover, as the government recognized, the VK page provided significant corroboration of Timku's testimony that the Gmail address belonged to Zhyltsou. As the AUSA argued in urging that the VK page should be admitted by the district court, the fact that "this particularly unique section of letters that make up his e-mail address [is] found on [Zhyltsou's] Facebook page with his picture go[es] a long way to proving that he is the owner of this address." J.A. 25-26. The district judge agreed that the evidence tended to establish that the Gmail address was Zhyltsou's. J.A. 29-30. Indeed, the AUSA pressed the significance of the VK profile in the final words of her summation, arguing to the jury that the defendant's own web page linked him – through the moniker "Azmadeuz" – to the Gmail account used to send

the birth certificate.  G.A. 65-66.

In sum, the government's proof on the issue of whether Zhyltsou transferred the fake birth certificate was not unassailable.  As a result, the printout of the VK profile was by no means cumulative, but played an important role in the government's case, which the AUSA augmented by highlighting the evidence in her summation.  *See United States v. Grinage*, 390 F.3d 746, 751 (2d Cir. 2004) ("Where the erroneously admitted evidence goes to the heart of the case against the defendant, and the other evidence against the defendant is weak, we cannot conclude that the evidence was unimportant or was not a substantial factor in the jury's verdict."). Because the wrongly admitted evidence was "the sort of evidence that might well sway a jury" confronted with a case otherwise turning solely on the word of a single witness whose credibility was weak, *Kaplan*, 490 F.3d at 123; *cf. id.* (discussing such proof in the context of a "marginal circumstantial case"), we conclude that the district court's error was not harmless and requires vacatur.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **VACATED** and the case is **REMANDED** for a new trial.