# IN THE COURT OF APPEALS OF IOWA

No. 18-1822
Filed April 1, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**EDWIN J. GOODWIN, JR.,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Joel W. Barrows, Judge.

The defendant appeals from his convictions of five counts of second-degree robbery and one count of ongoing criminal conduct through specified unlawful activity. **AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Ashley Stewart, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Greer and Ahlers, JJ.

**GREER, Judge.**

A jury convicted Edwin Goodwin Jr. of five counts of robbery in the second degree and one count of ongoing criminal conduct through specified unlawful activity. First, Goodwin maintains the trial court abused its discretion in admitting evidence of text messages over Goodwin's authentication and relevancy objections. He further contends the evidence at trial failed to support the "continuing basis" element of his conviction for ongoing criminal conduct and that trial counsel provided ineffective assistance by failing to object to evidence Goodwin fled from the police when they tried to apprehend him.[1]

**I. Background Facts and Proceedings.**

This case involves a series of thefts using a Craigslist guise. Jose Serrano responded to an ad he found on Craigslist selling an iPhone 8. At the seller's direction, Serrano was to meet him at the seller's home at 2134 East Locust Street on the evening of September 14, 2017. Serrano went to the apartment number he was directed to and knocked repeatedly, but no one came to the door. Texting he would leave, the seller directed Serrano to come to another apartment in a different building in the complex. Serrano thought it was strange, because the seller originally said they were to meet at his apartment, but Serrano complied and entered the second building. Serrano knocked on the second apartment door, and

---

[1] Goodwin claims ineffective assistance on direct appeal from the criminal proceedings. Because the judgments and sentences were entered before July 1, 2019, we are not prevented from deciding his claims by the amended Iowa Code section 814.7 (2019). *See State v. Macke*, 933 N.W.2d 226, 228 (Iowa 2019) ("On our review, we hold Iowa Code sections 814.6 and 814.7, as amended, do not apply to a direct appeal from a judgment and sentence entered before July 1, 2019.").

again no one answered. While Serrano waited in the apartment hallway, a man came up to him, pulled out a gun, and demanded the contents of Serrano's pockets. Serrano handed him the two $100 bills he brought to purchase the iPhone, and the man left. Serrano reported the crime to the police. On September 18, Serrano picked Goodwin out of a photo lineup as the person who robbed him.

In another Craigslist exchange, Ali Dammad listed an iPhone 7 for sale. A prospective buyer contacted Dammad by text message. At the buyer's direction, Dammad traveled to an apartment at 3943 Marquette Street to make the exchange. On September 14, at around 10:00 p.m., Dammad knocked at the apartment door and, following the buyer's direction, sent the buyer a text informing him he was at the door. While Dammad was waiting at the door, a man came out of a door[2] behind him, held a gun to Dammad's head, and demanded the phone. Dammad gave the man the iPhone 7, and the man left. Dammad called the police just after he left the scene. On September 22, Dammad picked Goodwin out of a photo lineup as the man who robbed him.

The next theft began with Matthew Roe listing an Apple Watch for sale on Craigslist. He and a prospective buyer had a conversation over text messages, which led to the buyer asking Roe to bring the Apple Watch to an apartment at 2134 East Locust on September 15 around 9:00 a.m. The buyer sent several texts while Roe was en route, wanting to know the exact time Roe would arrive at the apartment door. Roe text that he was outside the door. As Roe was standing there, a man approached him in the hallway, drew a gun from his waistband, and

---

[2] Dammad testified the man "came out of a utility closet or laundry room, something like that."

told Roe to "give [him] everything." Roe gave the man the Apple Watch and $120 from Roe's wallet, and the man let Roe leave. Once he got to his car, Roe immediately called 911. Roe gave the police a description, including the man's race and that he had dreadlocks and gold teeth.[3] Roe also gave the police the serial number from the Apple Watch the man had stolen. The Apple Watch, identified by the serial number, was later recovered from a local pawn shop. According to the pawn shop's record, Edwin Goodwin Jr. sold the Apple Watch to the pawn shop at 5:38 p.m. on the same day it was stolen from Roe.[4]

Next, Martin Rocha listed a MacBook Air for sale on Craigslist. After a series of text messages with a potential buyer, Rocha was directed to meet the buyer at 2134 East Locust Street at about 11:30 p.m. on September 15. When Rocha and his friend arrived at the designated address, no one answered the apartment door. As they exited the apartment building, a man with dreads, a round face, and gold teeth met them "outside at gunpoint." At the man's direction, Rocha handed over the MacBook Air and charger. When Rocha reported the incident to the police, he provided the serial number for the stolen laptop. The laptop was later recovered from a different local pawn shop. According to the pawn shop's

---

[3] This description points to Goodwin, although Roe's description of the man's height and weight was not consistent with Goodwin's. At Goodwin's trial, Roe identified Goodwin as the man who robbed him.

[4] According to the testimony of several witnesses, the local laws require all pawn shops to check and scan the government ID of anyone selling an item to the pawn shop. The pawn shop then sends the information of all purchases made by the pawn shop (and who it bought the items from) to the local police each day. Here, the pawn shop listed Goodwin, based on the ID presented to the pawn shop, as the seller of the Apple Watch.

records, Goodwin sold the MacBook Air to the pawn shop at 9:34 a.m. on September 16—the morning after it was stolen from Rocha.

Then on September 16, Zachary Strouth was contacted about an old ad he had placed on Craigslist. Strouth told the person he no longer had an iPhone 6 to sell but he did have iPhone 4s with a cracked screen for purchase. The buyer agreed to purchase the phone for $50 and wanted Strouth to come to 2134 East Locust Street to make the sale. Later, the buyer changed the location to 2326 East Locust Street and instructed Strouth to text him when he was "five minutes out." Strouth was also supposed to text when he was at the appropriate door. Strouth, unable to find the apartment that matched the number he was given, went back outside. "As soon as [he] hit the door onto the back steps of the apartment complex, [he] had a gun in [his] face." The man with the gun demanded, "Give me everything you got." Strouth refused to comply and walked away. When he got back to his vehicle, at around 11:06 p.m., Strouth called the police. Seeing suspicious behavior, Judy Reed, who lives in the 2300 block of East Locust St., called the police around 11:00 p.m. the same night. Shortly after two police cars with their lights flashing drove past, she "saw a gentleman with a lot of dreadlocks in their hair come running up [her] alley." The man ran behind her apartment building and, because there was a large drop off behind the units, came back around and "just trotted right in front of [her]." Reed thought the man was running away from something and noted his hesitation to go toward Locust Street; she testified:

> After he—well, he ran, like I said, in front of me and started heading down the stairs towards Locust Street, and then he halted in the middle of the stairs and looked like he wasn't sure whether he wanted

to go that way or come back up, and he headed back up which would be closer back to me.

Two days later, on September 18, Reed picked Goodwin out of a photo lineup as the man she saw run past her two nights earlier.

After this investigation, Goodwin was charged with five counts of robbery in the first degree, one count of felon in possession of a firearm, and one count of ongoing criminal conduct through specified unlawful activity.

At Goodwin's jury trial, each of the five people who were robbed testified. Police officers and detectives involved in the investigation testified as well. Detective Gordon Morse II testified he was surveilling an address Goodwin was linked to, the address of Demeranique Hodges, on September 20. Detective Morse saw Hodges and Goodwin exit the home, and he alerted other officers nearby. When the other officers tried to take Goodwin into custody, he fled on foot back towards Hodges's residence. Goodwin was found hiding in the rafters of the garage of the residence.

Detective Richard Voy testified Hodges's residence was of interest because "she supposedly is [Goodwin's] girlfriend, or a friend of Mr. Goodwin." Goodwin objected to the testimony, arguing it was hearsay. The State responded that it was offering the statement about Goodwin's and Hodges's relationship "for the purpose of subsequent conduct and the search, and the location of Mr. Goodwin and the association with the residence thereby." The district court overruled Goodwin's objection. Voy also testified that as part of the search warrant executed on Hodges's residence, the officers took and searched Hodges's cell phone. The State sought to admit evidence of text messages from

Hodges's phone to and from a person Hodges named "Edwin" in her contacts.

Goodwin objected:

> In those text messages there's incredibly incriminating text messages that's apparently come from whoever Edwin is. This material is only relevant if the defendant is this Edwin that s referred to.
>
> At this point there's been no real showing of a relationship between the two of them, other than he was present with this woman and hid in her garage at some point.
>
> . . . .
>
> . . . There's nothing to tie him to the phone number that is in that address book. I don't think we have any testimony from anyone that says that phone number is Edwin Goodwin's telephone number, it's just she's got a contact in her phone named Edwin, which could be Edwin Goodwin, it could be anyone named Edwin. I guess if you stretch plausib[ility], it could be anybody even with a fake name.
>
> My point is I don't think this is sufficient evidentiary tie between the defendant and the person listed in that address contact list on her phone. As a result, if it's not him, it's hearsay and irrelevant, and—it's just irrelevant, your Honor.

The district court responded:

> THE COURT: Well, the potential relevance seems manifest to me, frankly, and I think it's just circumstantial evidence, like all circumstantial evidence is. Obviously you're free to make the argument you just made in closing.
>
> THE STATE: I think it goes to weight rather than admissibility.
>
> THE COURT: I would agree. I mean, your objection right now is relevance. I see the potential relevance of it, so the objection is overruled.

Based on data extracted from Hodges's phone, "Edwin" sent Hodges a message on September 14 at 6:02 p.m. stating, "I'm tryna rob somebody off Craigslist lol." Hodges responded two minutes later, asking, "For what." Less than one minute later, Edwin said, "Couple hunnd." Then, at 6:22 p.m., Edwin sent a text, stating, "I did it 2 crispy 100s" and immediately sent a picture of two $100 bills. This text exchange occurred the same evening Serrano, who identified Goodwin as the robber, was robbed of two $100 bills.

The jury convicted Goodwin of five counts of second-degree robbery and one count of ongoing criminal conduct. Goodwin was later sentenced to a term of incarceration not to exceed ten years on each of the robbery convictions; he was ordered to serve those five sentences consecutively, for a total term not to exceed fifty years. Goodwin was sentenced to a period of incarceration not to exceed twenty-five years for his ongoing-criminal-conduct conviction and was ordered to serve the sentence concurrent to the others.

Goodwin appeals.

## II. Analysis.

### A. Text Messages.

Goodwin challenges the admission of the text messages between Hodges and "Edwin."[5] Goodwin maintains the evidence of the messages was not relevant to his case because the State never laid the proper foundation to authenticate the text messages were sent by him. We generally review evidentiary rulings for an abuse of discretion. *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003).

"To satisfy the requirement authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding the item is what the proponent claims it is." Iowa R. Evid. 5.901(a). We recognize that digital

---

[5] Goodwin does not challenge the physical print out of the information from Hodges's phone that was admitted as an exhibit. He only challenges the content and whether it was properly linked to him to make it relevant to his case. *See* Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.901:11 (Nov. 2019 Update) ("Although electronic evidence, by definition, exists in digital form, it is frequently offered into evidence as a tangible printout or screenshot. In such cases, two levels of authentication may be necessary: (1) authentication of the communication or underlying content that existed originally in digital form and (2) authentication of the physical download or printout of that content.").

evidence may be more difficult to link to a person than other types of evidence. *See* Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.901:11 (Nov. 2019 Update) ("Authentication of the original digital content of an electronic writing requires that its proponent produce evidence sufficient to show that the purported author of the communication, whether it be an email, a Facebook posting, or a text message, actually authored or published the content. In some respects, this is no different than authenticating a written letter. However, traditional methods of authentication may prove more difficult for electronic writings given 'the lack of handwriting, the absence of a physical location of the document and the inherent anonymity provided by posting on websites.'" (quoting *Sublet v. State*, 113 A.3d 695, 711 (Md. 2015))). Here, the phone number identified as that belonging to "Edwin" was not linked to Goodwin, and, even if it had been, there could be additional concerns whether Goodwin was the person using his phone when the messages were sent.

But, "[i]mportantly, 'the burden to authenticate . . . is not high—only a prima facie showing is required,' and a 'district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which a jury could reasonable find that the evidence is authentic.'" *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014) (referring to Federal Rule of Evidence 901) (quoting *United State v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009)); *see also State v. Paredes*, 775 N.W.2d 554, 561 (Iowa 2009) (holding when our rule of evidence is identical in all relevant aspects to its federal counterpart, "interpretations of the federal rule are often persuasive authority for interpretations of our state rule"). "This requirement is satisfied if sufficient proof has been

introduced so that a reasonable juror could find in favor of authenticity or identification." *United State v. Vayner*, 769 F.3d 125, 129–30 (2nd Cir. 2014) (citation omitted). "The ultimate determination as to whether the evidence is, in fact, what is proponent claims is thereafter a matter for the jury." *Id.* at 130. And the "proof of authentication may be direct or circumstance." *Id.* (citation omitted).

Here, the State established that Goodwin and Hodges were at least friends. Even without the detectives' characterization of Hodges being Goodwin's girlfriend, Goodwin and Hodges were seen leaving Hodges's home together. When police tried to apprehend him, Goodwin fled back to Hodges's home and hid in her garage. Additionally, the text messages from Edwin about committing a robbery for a couple of hundred dollars involving a Craigslist post and the robbery of Serrano for that same amount and with the same modus operandi took place on the evening of September 14. Serrano testified that it was two $100 bills stolen from him, which matched what Edwin sent in a photo. Serrano identified Edwin Goodwin as the person who robbed him in a photo lineup and again at trial.

There was enough circumstantial evidence linking Goodwin to the texts sent by Edwin to let the jury decide whether it believed he was the sender.[6] The district court did not abuse its discretion in admitting the evidence.

---

[6] Goodwin also takes the argument one step further, maintaining that because it was not established he was the sender of the text messages, the messages are hearsay statements that do not fall within an exception to the hearsay rules (and are not non-hearsay due to being an opposing party's statement). *See* Iowa R. Evid. 5.801(d)(2)(A). Because we find there was sufficient authentication to link the text messages to Goodwin, the statements are non-hearsay as an admission by a party opponent, and Goodwin's hearsay argument fails.

**B. Sufficiency of the Evidence.**

Goodwin challenges the sufficiency of the evidence supporting his conviction for ongoing criminal conduct through specified unlawful activity, maintaining the State did not establish the robberies were on a "continuing basis." *See* Iowa Code § 706A.1(5). We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013). "In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Id.* (citation omitted).

To begin, we have compared the underlying purpose of Iowa Code chapter 706A to the purpose of the Racketeer Influenced and Corrupt Organizations Act (RICO),[7] finding them to be similar. *State v. Reed*, 618 N.W.2d 327, 334–35 (Iowa 2000) (providing the interpretation given to "pattern of racketeering activity" in the RICO context is a reasonable one for "continuing basis" in section 706A.1(5)). Likewise in this context, "'specified unlawful activity' means any act, including any preparatory or completed offense, committed for financial gain on a continuing basis, that is punishable as an indictable offense under the laws of the state in which it occurred and under the laws of this state." Iowa Code § 706A.1(5). Our supreme court has interpreted "continuing basis" to require a relationship between the predicate acts and the threat of continuing activity. *Reed*, 618 N.W.2d at 334–35 ("It is this factor of continuity plus relationship which combines to produce a

---

[7] 18 U.S.C. § 1962(c).

pattern."). "[A] continuing basis may be found, even where predicate acts occur over a short period of time, if there is a demonstrated relationship between the predicate acts and a threat of continuing criminal activity." *State v. Banes*, 910 N.W.2d 634, 640–41 (Iowa Ct. App. 2018) (alteration in original).

"[T]he relationship element of a pattern can be shown if the predicate acts 'have the same or similar purposes, results, participants, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id.* at 641 (alteration in original) (citation omitted). Here, the relationship element is easily met: five robberies started by posting or responding to Craigslist ads, sending the victim to a nearby apartment building, and coming up behind them with a weapon while they wait at the designated location, all done to make money—either by directly robbing the individual of cash or by pawning stolen items.

But the controlling question here is whether the State established continuity. Continuity can be established two ways. First, the State may demonstrate "continuity over a closed period by proving a series of related predicates extending over a s*ubstantial period of time*." *See Reed*, 618 N.W.2d at 335 (citation omitted) (emphasis added). Goodwin argues five robberies over three days is not a long enough of time period to show continuity. We agree. *See Banes*, 910 N.W.2d at 641 (concluding a series of commercial burglaries committed over a period of a few days "was not a series of related predicates over 'a substantial period of time'" (citation omitted)); *see also Reed*, 618 N.W.2d at 335 ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." (citation omitted)). Second, continuity can be shown by

"past conduct that by its nature projects into the future with a threat of repetition." *Reed*, 618 N.W.2d at 334 (citation omitted).

In *Reed*, our supreme court found the predicate acts of dealing drugs, coupled with the "stash" of drugs recovered, and the monthly payment to store the drugs, showed that the defendant had an ongoing business in dealing drugs and intended to continue such business in the future. 618 N.W.2d at 336. Compare that factual scenario to *Banes.* 910 N.W.2d at 638. In *Banes*, the defendant was driving around "trying to find stuff to steal" and committed a series of commercial burglaries over a few days. *Id.* Our court noted that neither Banes nor the accomplice, who both testified at trial, identified any plan for future conduct. *Id.* at 641. That the defendant was unemployed did not by itself establish continuity. *Id.*

Here, we have something between the two cases of *Reed* and *Banes.* The State did not offer any direct evidence that Goodwin planned to commit more robberies in the future. No other Craigslist ads were directly linked to him,[8] and no such statement was made by Goodwin. *Cf. State v. Agee*, No. 02-0967, 2003 WL 22087479, at *2 (Iowa Ct. App. Sept. 10, 2003) (affirming conviction for ongoing criminal conduct where the actions of the defendant shortly before his arrest and the items found in the defendant's possession at the time of arrest, "including a police scanner and a numerical list of eleven financial institutions found in [the

---

[8] Serrano testified about another Craigslist post that he "believe[d] . . . was this individual that put another phone posting" because "it almost sounded exactly the same as the one that [he] answered." Serrano sent texts back and forth with the person who posted the ad. The seller wanted to meet at an apartment complex on 35th Street, but Serrano refused. Later, the seller wanted to meet Serrano downtown, but again Serrano refused. The posting was later taken down—possibly because the seller had sold the listed phone.

defendant's] wallet, indicated that [the defendant] and [a second man] were engaging in a well-organized scheme of fraud *that was not limited to the particular victims in this case*" (emphasis added)). Additionally, unlike *Reed,* with the stash of drugs supporting the inference of future drug sales, no such evidence existed; police did not even locate the gun purportedly used in the robberies. On the other hand, Goodwin's crimes were not crimes of opportunity. Goodwin's crimes involved planning and strategy. He did not happen upon closed businesses while he drove around looking for some place to rob; he placed and responded to several ads on Craigslist, texting back and forth with his intended targets, directing them where to go, and generally trying to put them off their guard by telling them they would be meeting a woman at the home to which he was sending them. Still, without anything to suggest Goodwin intended to commit more robberies, we agree there was insufficient evidence to support Goodwin's conviction for ongoing criminal conduct through specified unlawful activity.

The State responds that Goodwin's criminal conduct was only stopped by police intervention. *See State v. Russell*, No. 08-2034, 2010 WL 786207, at *2 (Iowa Ct. App. Mar. 10, 2010) (finding substantial evidence supported "continuing basis" because, "[a]lthough the time frame of the criminal activity was not lengthy, it was shortened by the successful intervention by law enforcement"). We do not believe that is a fair characterization of the evidence. Goodwin committed two robberies on both September 14 and September 15, and he committed the fifth and final robbery on September 16. While it is possible Goodwin was running from the police when Judy Reed saw him around 11:00 p.m. on September 16, he was not apprehended. Police did not apprehend him until September 20. The State

suggests that a rational juror could infer that Goodwin was just waiting "until the heat died down" to resume using Craigslist to rob people, but the State has no evidence to support the future robberies—just the notion that if it worked in the past, Goodwin would likely try it again. In *State v. Harrington* and *Banes*, this court decided such an inference was not enough to support a conviction. *State v. Harrington*, No. 08-2030, 2010 WL 2925696, at *3 (Iowa Ct. App. July 28, 2010) (denying State's argument that the "very nature" of three burglaries, where homes of several neighbors were burglarized on one morning, combined with the defendant's lack of employment established a threat of repetition); *see Banes*, 910 N.W.2d at 641 (finding that the State had not established a continued threat of future criminal conduct, where the unemployed defendant committed several commercial burglaries over a period of a few days but did not testify about any future plans to commit crimes).

Although past behavior is often a good predictor of future behavior, we cannot rely on that axiom in the criminal-law context without specific evidence to show Goodwin's ongoing intent. Here, the State failed to provide substantial evidence to support the conviction for ongoing criminal conduct through specified unlawful activity.

Because Goodwin's conviction for ongoing criminal conduct is not supported by substantial evidence even when the evidence is viewed in the light most favorable to the jury's verdict, this conviction and sentence must be vacated. *See Banes*, 910 N.W.2d at 641.

**C. Ineffective Assistance of Trial Counsel.**

Finally, Goodwin maintains his trial counsel provided ineffective assistance by failing to object to evidence Goodwin fled when police officers tried to apprehend him outside Hodges's home on September 20. To prevail on a claim of ineffective assistance of counsel, a claimant must show "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Clay*, 824 N.W.2d 488. 495 (Iowa 2012) (citation omitted). "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008) (citation omitted). "If the defendant fails 'to establish either of these elements, we need not address the remaining element.'" *Nguyen v. State*, 878 N.W.2d 744, 754 (Iowa 2016) (citation omitted).

Goodwin maintains evidence of his flight should not have been allowed at trial because Goodwin was not being apprehended for the robberies at that time, so any inference about his state of mind as to his guilt was improper. *See, e.g.*, *State v. Wimbush*, 150 N.W.2d 653, 656 (Iowa 1967) ("We have held many times that evidence of escape from custody and flight of an accused is admissible as a criminal circumstance."). The State responds that Goodwin may have believed he was being apprehended for the robberies, as the minutes of testimony[9] state that on September 20, when officers were searching "the other address for Goodwin, he (Goodwin) text [his roommate] and wanted him to call 911 and report something so maybe we would stop searching for him."

---

[9] This evidence was not offered at trial.

Despite what Goodwin knew about the police investigation of the robberies, we can decide this claim on the prejudice prong, as the evidence of Goodwin's guilt to the five robberies is overwhelming. *See State v. Ambrose*, 861 N.W.2d 550, 557 (Iowa 2015) (recognizing the case could be resolved under the prejudice prong and starting the analysis there); *see also State v. Parker*, 747 N.W.2d 196, 210–11 (Iowa 2008) (concluding counsel's failure to object to prior-bad-acts evidence did not affect the outcome of the trial because the evidence of the defendant's guilt was overwhelming). In two of the instances, the robberies of Serrano and Dammad, both targets identified Goodwin in a photo lineup as the man who robbed them. With the robberies of Rocha and Roe, Goodwin presented his government ID to and sold the items—matched by their serial numbers—to local pawn shops shortly after the robberies. As to the fifth robbery—involving Strouth—the modus operandi matched that of the first four robberies. And Judy Reed placed Goodwin in the area at the same time as the incident, as she saw him running away shortly after she saw police cars speed by. Even if the jury should not have been allowed to hear evidence that Goodwin fled police, our confidence in the outcome of Goodwin's five robbery convictions is not undermined.

**III. Conclusion.**

The court did not abuse its discretion in admitting evidence of text messages over Goodwin's authentication and relevancy objections, and Goodwin's ineffective-assistance claim fails because he cannot establish prejudice. That said, because insufficient evidence supports the "continuing basis" of Goodwin's ongoing-criminal-conduct conviction, we vacate that conviction and

sentence.  We remand this matter for entry of dismissal with prejudice of the charge.  *See Bane*, 910 N.W.2d at 643.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**