2021 IL App (1st) 190368-U

FIRST DISTRICT
FIRST DIVISION
June 28, 2021

No. 1-19-0368

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 15 CR 1289 (02) |
| | ) | |
| DEANDRE BROWN, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justice Pierce concurred in the judgment.
Presiding Justice Walker dissented.

**ORDER**

¶ 1     *Held*: Defendant received effective assistance of counsel. Photographs of social media posts were properly admitted as identification evidence. Remand for resentencing on defendant's as-applied constitutional challenge is not warranted.

¶ 2     Following a joint jury trial, defendant Deandre Brown and codefendant Alonzo Bell[1] were convicted of attempt first-degree murder of Laquita Weatherspoon and Leemanual Burrell, while personally discharging a firearm. Defendants were sentenced to mandatory consecutive terms of 26 years of imprisonment on each count (6 years on the attempt murders with 20-year enhancement

_____

[1] Codefendant Bell appealed separately, and this court affirmed his conviction and sentence. *People v. Bell,* 2021 IL App (1st) 190366.

for personally discharging a firearm), for a total of 52 years. On appeal, defendant argues that: (1) he was denied effective assistance of counsel; (2) social media evidence was improperly admitted; and (3) his sentence was unconstitutionally disproportionate to the nature of the offenses. We affirm.

¶ 3                                                    BACKGROUND

¶ 4                                                    Motion *in limine*

¶ 5        On the evening of December 17, 2014, Weatherspoon and her boyfriend Burrell were shot at multiple times by two gunmen. The assailants fled and were not immediately arrested. While in the hospital recovering from her injuries, Weatherspoon received a Twitter follow request and recognized the shooters in four Twitter posts associated with that account. She took a screenshot of each post.

¶ 6        In the first screenshot, the "#DumpStreet@Ebub" account tweeted the following at 11:19 a.m. on December 18, 2014: "#NoNo yu Wnt RichGang Or Quitta me 👇 👇 💯 😩 😂 😬 🚷 🔫" Weatherspoon recognized defendant in that account's profile picture as one of the shooters. In the second screenshot, "#DumpStreet@Ebub" re-tweeted from the "Land Lord Zo@landlordzo" account: "You ain't dead yet . . . 😈 but you can be boi 💯." Weatherspoon recognized codefendant in the profile picture of the "Land Lord Zo" account as one of the shooters. In the third screenshot, "#DumpStreet@Ebub" tweeted a photo of the defendants and a third individual, all holding guns with the caption: "We dnt Kno what Tha Net beef Abt Itz a Drill Inna Town so Nobody hand Out 😤". From that tweet, Weatherspoon recognized the gun in codefendant's hand as the same gun he used to shoot her. The last screenshot was a single image of codefendant holding two guns.

¶ 7        The State moved to admit the four screenshots at trial because they were (1) relevant to

Weatherspoon's identifications, (2) circumstantial evidence of defendant's involvement, and (3) corroboration of defendant's connection to codefendant. Defendant's written motion *in limine* alleged that the "prejudicial effect greatly outweigh[ed] any probative value associated with the identification." With the exception of the last screenshot, the trial court ruled that the screenshots were relevant and admissible because "one of the people who was shot identified the two defendants as sitting here in this case through a photograph that she got through Twitter and that's how an identification was made." The trial court also found that the proper foundation was laid because "any argument regarding who sent the tweets *** would go to the weight not the admissibility."

¶ 8                                Jury Trial

¶ 9        Weatherspoon testified that around 8:30 p.m. on December 17, 2014, she and Burrell stopped at 51st and Ada on their way downtown for dinner. When they arrived, Burrell parked on the left side of the one-way street. About a minute later, a car "driving slow[ly] by" stopped in front of the hood of their car. A second car stopped "towards the trunk of the vehicle but on the side." She heard Burrell say "what," looked up from her cellphone, and saw a man "standing there with a gun." Weatherspoon identified codefendant Bell as the "[s]hort, light skinned, short haircut" man she saw standing outside the car holding "a two toned silver and black gun" with a long clip. She identified defendant, who had dark skin and braids, as the second man standing there holding a gun. When she saw the defendants "pointing those guns," she "jumped to the back of the vehicle."

¶ 10        Weatherspoon heard about 30 gunshots. After the shooting stopped, defendants and the two vehicles were gone. Weatherspoon was shot twice and Burrell was shot in the head and arm. Desire Brown, a neighbor from across the street, and her son, N. L., helped Weatherspoon into their house where she stayed until an ambulance arrived.

¶ 11        While checking her cellphone at the hospital, Weatherspoon noticed a request to follow her Twitter account from "#DumpStreet@EHub." She recognized defendant in the profile picture of that account and saw that at 11:19 a.m. on December 18, 2014, "#DumpStreet@EHub" tweeted "#NoNo yu Wnt RichGang or Quitta me," referencing her nickname "Quitta." Weatherspoon interpreted the tweet to mean that defendant "was laughing at the incident and *** He's like 'You [won't] catch me how we caught her.' "

¶ 12        In another Twitter post, Weatherspoon saw "#DumpStreet@EHub" re-tweet "You ain't dead yet …. but you can be boi" posted by "Land Lord Zo." Weatherspoon recognized both defendants in the profile picture of the "Land Lord Zo" account. She understood the re-tweet to mean that "he found out that we wasn't dead. But then he's like, I guess he is still gonna try. But you can be."

¶ 13        The next day (December 19), Weatherspoon saw another tweet from "#DumpStreet@EHub" that showed defendant and codefendant standing next to each other and codefendant was "holding the [two toned] gun that [she] was shot with." After seeing the tweets, she was scared she "was a target" but did not immediately contact the police and "just left it alone."

¶ 14        On December 29, 2014, Chicago police detective Terry Teahan contacted Burrell and Weatherspoon regarding viewing lineups of possible suspects. Burrell refused to cooperate in the investigation. When Weatherspoon arrived at the police station, she told Teahan about the messages that she had received over Twitter. A few hours later, Weatherspoon identified defendants in separate lineups "as the men who shot her." Weatherspoon "had never told [Teahan] what kind of weapon she had been shot with" prior to that day.

¶ 15        During the investigation, N. L. told Teahan that on the night of the shooting, he looked out his front window and saw two black men shooting handguns. N.L. identified codefendant in a

lineup as the individual he saw "run from the scene of the shooting, outside of the victim's vehicle, get into a waiting car, and flee the scene." He was unable to identify defendant.

¶ 16    In a written statement provided to police, N.L. indicated that he "was not under the influence of drugs or alcohol" and that around 8:50 p.m., he:

(1) heard approximately 20 to 30 gunshots outside his home;

(2) looked out the front window onto Ada Street and saw a black Tahoe and a silver, four-door car behind the black Tahoe stopped in the middle of the street directly in front of his house;

(3) saw a black male with dreadlocks and a light skinned black male with a short "fade" haircut standing outside the cars;

(4) saw the two men tuck an unidentified object into their pockets; and

(5) saw the male with dreads get into the back seat of the black Tahoe, the other male got in the passenger seat of the silver car, and both cars drove off.[2]

¶ 17    Defendants were arrested together 11 days after the shootings. A "black and silver gun" was recovered at the scene of an unrelated murder that occurred approximately three minutes prior to their arrests. In order to cast doubt on Weatherspoon's testimony, the defense moved to introduce evidence that the gun recovered at the time of their arrests was not the same gun used in this shooting.

¶ 18    In response to the State's objection that there was no nexus between the defendants and the gun recovered at the murder scene, the court ruled that:

"if the reason that they're looking for a gun after they arrest the Defendants, is

---

[2] At trial, N.L. denied virtually everything reflected in his written statement, claiming he had been "smoking in his room" and was "under the influence" of drugs at the police station. He only signed the statement because his mother wanted him to.

because they suspect these individuals had something to do with the murder, and it's the murder investigation, I would not let you bring it in, defense.

However, if they just find the gun, unrelated to the murder investigation, and you want that in, defense, and if your clients agree that you want that in, that they get pulled over, they run, they get arrested, and Officers find a gun, and you want to make a point that that gun wasn't used in this shooting, I would allow that."

The trial judge then inquired of the defendants, as follows:

"THE COURT: Okay. Mr. Brown and Mr. Bell, you heard what [Brown's defense counsel] was arguing here, correct?

DEFENDANT BROWN: Yes.

DEFENDANT BELL: Yes.

THE COURT: All right. You agree with that strategy, that that's what you want to do?"

DEFENDANT BROWN: Yeah.

DEFENDANT BELL: Yeah."

After confirming that both defendants were in agreement with this strategy, the court agreed to "allow the circumstances of how they got arrested, and the fact that the weapon was recovered since it was recovered in relation to their arrest," but not as proof of other crimes.

¶ 19 The jury found defendant guilty of attempt first-degree murder of Weatherspoon and Burrell while personally discharging a firearm.

¶ 20 Motion for a New Trial

¶ 21 Defendant retained a new attorney to represent him in the posttrial proceedings. At the evidentiary hearing on defendant's motion for a new trial, former counsel testified that "towards

the end of our trial preparation *** [defendant] indicated to me that he could get his grandfather to come in and testify on his behalf that he was painting that day and that night of the incident." After considering this alibi as a possible trial strategy, he explained to defendant that "it's been my experience of 42 years in this building that alibi defenses particularly with close relatives have to be very thorough and for the most part I found them very ineffectual in rebutting the State's case." Since defendant had no corroborating evidence of his alibi, counsel did not further investigate the matter "[b]ecause I took him at his word that *** [his grandfather] would be a good witness, but that in and of itself *** would be ineffectual based on my experience." Counsel further explained:

"it's been my experience in alibi defenses that if you are really pounding away at the State in their inability to prove the defendant's guilt beyond a reasonable doubt if all of a sudden your only defense was this one individual claiming an alibi by a relative with relatively no corroboration other than his demeanor and credibility then juries have a tendency based on my experience to weigh the State's case versus the Defense's case, and in this particular case I felt that the State's case would totally overwhelm a single individual who was a relative claiming that the defendant was at a place other than at the scene of the incident."

¶ 22 As to the allegation that trial counsel failed to prove-up impeachment of Weatherspoon regarding (1) her description of defendant; (2) the distance she viewed defendant; and (3) her failure to mention the two-tone gun shortly after the shooting, he stated that he "got it out in front of the jury and the jury heard it." He explained that "if I started calling two or three impeachment witnesses in the Defense'[s] case it would absolutely take away my argument about proof beyond a reasonable doubt by the State."

¶ 23 Regarding the gun that was recovered at the time of defendant's arrest, trial counsel

explained that he proposed using the gun because "[a]lthough his other arrest would be somewhat prejudicial I thought the probative value of [the gun] that he is found with was not the one that was used in the offense was something in our favor and at that point of the trial I felt that we needed that. *** [I] mentioned to [defendant that I thought] it would be helpful in the strategy of our case that we brought this out."

¶ 24 Charles Simpson, defendant's grandfather, testified that on December 17, 2014, he spent the day painting the house with defendant. At around 8 or 9 p.m., they finished painting for the day and defendant "was either in his room or in the front room *** doing his music." From 7 or 8 a.m. until he went to sleep that night, Simpson did not leave the house or see defendant leave the house.

¶ 25 The trial court denied defendant's ineffective assistance of counsel claims, finding that "both attorneys were focused, there was a theory *** when you look at the evidence, it was the right theory. It's an identification case."

¶ 26 In imposing the mandatory minimum sentence, the trial judge acknowledged that defendant was 18-years old when he committed the offense. The court sentenced defendant to 26 years' imprisonment on each attempt first-degree murder count and found that severe bodily injury to Weatherspoon triggered mandatory consecutive sentencing for a total term of 52 years' imprisonment. Defendant's motion to reconsider the sentence was denied.

¶ 27 ANALYSIS

¶ 28 Defendant first argues that trial counsel was ineffective because he (1) failed to investigate an alibi defense, (2) failed to prove-up impeachment of the victim, and (3) introduced a collateral gun. He also argues that the cumulative effect of trial counsel's errors deprived him of a fair trial.

¶ 29 A criminal defendant has "a sixth amendment right to the effective assistance of counsel."

*People v. Cole*, 2017 IL 120997, ¶ 22. Claims of ineffective assistance of counsel are analyzed under the *Strickland* test, where a defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant demonstrates deficient performance by establishing that counsel's performance fell below an objective level of reasonableness and prejudice is established if there is a reasonable probability that the outcome at trial would have been different absent the alleged errors. *Id.* The defendant must satisfy both prongs to prevail on an ineffective assistance of counsel claim. *Id.* at 697; *People v. Cherry*, 2016 IL 118728, ¶ 24.

¶ 30        A strong presumption exists that counsel's performance was effective and resulted from sound trial strategy. *Strickland*, 466 U.S. at 689; *People v. Dupree*, 2018 IL 122307, ¶ 44. Our supreme court has "made it clear that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Where, as here, the trial court reached a decision on the merits of defendant's ineffective assistance of counsel claim, we will not disturb that ruling unless there was manifest error. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. " 'Manifest error' is error that is clearly plain, evident, and indisputable." *Id.*

¶ 31        Initially, defendant argues that "the failure to interview Charles Simpson, or even seriously consider calling him as a witness, violated his right to effective assistance of counsel."

¶ 32        "Trial counsel has a professional duty to conduct 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *People v. Domagala*, 2013 IL 113688, ¶ 38 (quoting *Strickland,* 466 U.S. at 691). Any alleged "[l]ack of investigation is to be judged against a standard of reasonableness given all of the circumstances, 'applying a heavy

measure of deference to counsel's judgments.' " *People v. Kokoraleis,* 159 Ill. 2d 325, 330 (1994) (quoting *Strickland,* 466 U.S. at 691). If "circumstances known to counsel at the time of his investigation do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation." *People v. Pecoraro,* 175 Ill. 2d 294, 324 (1997).

¶ 33     In this case, trial counsel had a sound basis for not further investigating or presenting an uncorroborated alibi defense from defendant's grandfather. Counsel testified that "towards the end of our trial preparation" (approximately two and a half years after he first began representing defendant), defendant informed him that he could get his grandfather to come in and testify that he was painting his house "that day and that night of the incident." Upon confirming that defendant was unable to corroborate his alibi, trial counsel reasonably assessed that "weak alibi testimony" from a close relative could cause the jury to "weigh the State's case versus the Defense'[s] case" and find that the State's case "totally overwhelm[ed]" defendant's alibi. See *People v. Williams*, 2017 IL App (1st) 152021, ¶ 40 ("[i]t was not unreasonable trial strategy to decide not to present alibi testimony of defendant's sisters because their close relationship to [defendant] could have resulted in their testimony carrying little weight with the jury.").

¶ 34     Counsel testified that he accepted defendant's belief that the grandfather would "be a good witness," but still felt that "the State's case would totally overwhelm a single individual who was a relative claiming that the defendant was at a place other than the scene of the incident." See *People v. Logan*, 2011 IL App (1st) 093582, ¶¶ 56, 57 (no ineffective assistance of counsel not to call an alibi witness out of concern that "the jury would shift the burden of proof to the defense"). The trial court finding that defense counsel exercised reasonable trial strategy was not manifestly erroneous.

¶ 35     Second, defendant argues that trial counsel provided ineffective assistance because he

failed to perfect impeachment of Weatherspoon "on the vital issue of identification" regarding (1) her description of the shooters, (2) the distance she viewed the shooters, and (3) her failure to tell police about the black and silver two-tone gun before viewing the gun in the Twitter posts.

¶ 36    "Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel." *Pecoraro,* 175 Ill. 2d at 326. When evaluating the failure to impeach for purposes of a *Strickland* claim, "[t]he value of the potentially impeaching material must be placed in perspective." *People v. Jimerson,* 127 Ill. 2d 12, 33 (1989).

¶ 37    Trial counsel vigorously challenged Weatherspoon's identification testimony during his cross-examination.[3] Counsel explained that in order "to avoid the improper inference that the defense bore the burden of proof" and to highlight weaknesses in the State's case, he did not call multiple witnesses to perfect impeachment of Weatherspoon. That decision was within the realm of reasonable trial strategy and was not objectively unreasonable. See *People v. Custer,* 2019 IL 123339, ¶ 39 (counsel's decisions to call and examine witnesses falls under the heading of "trial strategy"); *People v. Peterson,* 2017 IL 120331, ¶ 80, *as modified on denial of reh'g* (Jan. 19, 2018) (mistakes in trial strategy or defense counsel's error in judgment do not render representation ineffective); *People v. Lewis,* 2015 IL App (1st) 122411, ¶ 85 (counsel's trial strategy includes consideration of "the costs and benefits of calling particular witnesses and pursuing particular questions"). The fact that another attorney with the benefit of hindsight may have cross-examined or impeached Weatherspoon differently does not render counsel's performance constitutionally ineffective. *People v. Massey,* 2019 IL App (1st) 162407, ¶ 31. Here,

_____

[3] Counsel further explained during the posttrial hearing, "I'm standing in front of the jury with a police report in my hand and I'm making the point on cross-examination didn't you tell officer so and so *** But I made my point in front of the jury holding a police report."

defendant failed to show trial counsel's strategy amounted to a complete failure "to conduct any meaningful adversarial testing." *People v. West*, 187 Ill. 2d 418, 433 (1999).

¶ 38    For example, defendant claims that Weatherspoon's testimony that she identified the weapon before she received the Twitter posts was contradicted by Detective Teahan, who testified that she did not identify the weapon until after she was interviewed at the police station on December 29, 2014. Because Detective Teahan testified she did not identify the weapon the night of the shooting, the jury heard this evidence and defendant was not prejudiced by any failure to perfect impeachment of her testimony on this issue. Another claimed error was the failure to impeach Weatherspoon's description of one of the assailants as weighing over 200 pounds. There was no testimony at trial or at the posttrial hearing that Weatherspoon made such a description. The basis for defendant's argument here is from information that is apparently contained in an early police report. Since the record does not establish that Weatherspoon is the source of that information in the report, there was no basis for counsel to perfect any impeachment of her on that point. Notably, it was not shown at the hearing for a new trial that she identified one assailant as weighing over 200 pounds, so any alleged prejudice to defendant by a failure to perfect impeachment is based on speculation and conjecture. Weatherspoon testified that she never told the paramedics that the shooters were 20 feet away. Assuming she did make this statement, counsel admittedly did not perfect impeachment by calling the paramedics to testify on this point. However, and assuming the paramedics would have attributed this statement to Weatherspoon, which is also not established in this record, calling those witnesses would have provided another opportunity for the State to highlight the brutality of the crime by eliciting testimony from the paramedics about Weatherspoon's condition moments after being shot multiple times.

¶ 39    Third, defendant argues that he was denied effective assistance of counsel when the defense

introduced evidence "to connect [him] to another gun, eleven days after the incident on trial" to show that the gun identified by Weatherspoon in the Twitter screenshot was not "the gun recovered at the time of arrest."

¶ 40       The fact that counsel's efforts to cast doubt on Weatherspoon's testimony were unsuccessful does not establish ineffective assistance. *Massey*, 2019 IL App (1st) 162407, ¶ 31 (unsuccessful strategies do not equate to ineffective assistance of counsel); *People v. Knowles*, 2019 IL App (3d) 180190, ¶ 25 (decision to call an expert "amounted to trial strategy as it cast doubt on multiple pieces of the State's evidence"). Moreover, as the trial judge correctly recognized, the defendant expressly consented to counsel's strategy.[4] *People v. Fair*, 159 Ill. 2d 51, 79 (1994); *People v. Page*, 155 Ill. 2d 232, 262-63 (1993).

¶ 41       Finally, defendant argues that trial counsel's cumulative errors resulted in ineffective assistance. In addition to his other claims, he complains that trial counsel (1) failed to object to Weatherspoon's testimony that she suffered multiple miscarriages after the shooting and (2) told the jury that the defense "would not present evidence in opening statements, when the trial had not yet unfolded."

¶ 42       Counsel reasonably recognized that Weatherspoon's testimony "is fairly prejudicial [and] calls for a lot of sympathy on behalf of the jury, but in the same sense I have to weigh my objections because jurors *** think when somebody objects *** they're trying to hide something." Likewise, advising the jury that "we will not call one witness" was legitimate strategy designed to hold the State to its burden of proving that "these two defendants were the people" who committed this crime. Since defendant's individual claims of error do not rise to the level of ineffective assistance,

_____

[4] Specifically, the trial judge found that "they're paying attention," "[t]hey heard my arguments *** speaking in regular terms as to what was happening," and it was not "so beyond their understanding that they didn't understand what was happening."

cumulative error analysis is not necessary. See *Peterson*, 2017 IL 120331, ¶ 88 (quoting *Strickland*, 466 U.S. at 689) (" 'There are countless ways to provide effective assistance in any given case' "); *People v. Easley*, 192 Ill. 2d 307, 344 (2000) ("a defendant is entitled to a fair trial, not a perfect one [and] ineffective assistance of counsel refers to competent, not perfect, representation").

¶ 43    Because defendant has failed to establish that trial counsel's performance was deficient, we need not consider his claim that he was prejudiced by the deficient performance. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). Based on defendant's inability to satisfy both prongs of the *Strickland* test, the trial court's finding that he received effective assistance of counsel was not manifestly erroneous. *Cherry*, 2016 IL 118728, ¶ 24; see *Easley*, 192 Ill. 2d at 344 (a fair trial is one "free of errors so egregious that they probably caused the conviction or the sentence").

¶ 44    Defendant next claims that "admission of the 'Twitter' evidence *** and photos of defendant *** was an abuse of discretion" because there was no direct or circumstantial proof of authentication.

¶ 45    We review a trial court's admission of social media evidence for an abuse of discretion. *People v. Brand*, 2020 IL App (1st) 171728, ¶ 24, *appeal allowed*, 154 N.E.3d 786 (Ill. 2020). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 46    "Statements of identification" are admissible to demonstrate the steps of an investigation and explain why the defendant became a suspect. 725 ILCS 5/115-12 (West 2014); *People v. Flores*, 2014 IL App (1st) 121786, ¶ 72. A witness's "statement of identification" is construed "to include the entire identification process [to] ensure that a trier of fact is fully informed concerning the reliability of a witness' identification, as well as the suggestiveness or lack thereof in that

identification." *People v. Tisdel*, 201 Ill. 2d 210, 219 (2002). This holds true for identifications made through social media evidence. *People v. Holliday*, 2020 IL App (5th) 160547, ¶¶ 63-64.

¶ 47     Relying on *People v. Kent*, 2017 IL App (2d) 140917, defendant argues that the screenshots of the Twitter posts lacked sufficient authentication because there was no evidence that defendant created either Twitter account. In *Kent*, the victim was shot dead in the driveway of his residence. *Id.* ¶ 4. The day after the murder, a detective searched Facebook and found a profile that included a photograph of someone resembling the defendant along with a post stating "its my way or the highway ….. leave em dead n his driveway." *Id.* ¶¶ 5, 57. The detective took a screenshot of the post and the State sought to use it as an admission by the defendant. *Id.* ¶¶ 5, 114. The *Kent* court explained that "to argue that the Facebook post was tantamount to an admission that defendant killed the victim in his driveway," there must be " 'some basis' on which a reasonable juror could conclude that the post was not just any Internet post, but was in fact created by defendant or at his discretion." *Id.* ¶ 119. Because there was no direct or circumstantial proof of authentication, the court held that the Facebook evidence was improperly admitted. *Id.* ¶¶ 119, 122.

¶ 48     Unlike in *Kent*, the Twitter screenshots in this case were not used as an "admission" that defendant was the shooter, but to demonstrate how Weatherspoon identified defendant as her assailant. This case is more analogous to *People v. Holliday*, 2020 IL App (5th) 160547, ¶¶ 16, 64, where the victim identified his assailant and the gun used from a Facebook post. In *Holliday*, this court held that the victim's "testimony about finding photographs on Facebook, recognizing the subject in the photographs as the defendant, and recognizing the gun in the photograph as the one he was shot with was admissible as statements of identification." *Id.* ¶¶ 62-64.

¶ 49     The Twitter screenshots in this case were also "statements of identification" because Weatherspoon identified defendant as a shooter from those tweets. See *People v. Holveck*, 141 Ill.

2d 84, 105 (1990) (victim's out-of-court identification of the defendant viewed in a newspaper properly admitted); *People v. Arman*, 131 Ill. 2d 115, 123 (1989) ("no dispute that when identification is a material issue at trial, testimony relating to the use of mug shots in an investigation may be introduced to show how a defendant was initially linked to the commission of an offense"); *People v. Temple*, 2014 IL App (1st) 111653, ¶ 41 (witnesses' description of defendant was considered steps in the identification process and admissible as statements of identification); *People v. Thompson*, 2016 IL App (1st) 133648, ¶ 41 (immediate identification of the assailant not required). Moreover, Weatherspoon testified that the screenshots fairly and accurately depicted the Twitter posts at the time she took the shots. Therefore, the trial court did not abuse its discretion in admitting the Twitter screenshots into evidence.

¶ 50        Defendant also argues that "his sentence of 52 years was violative of the proportionate penalties clause of the Illinois Constitution, and that his cause should be remanded for resentencing." The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). As-applied constitutional challenges to a sentence "are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *People v. Harris*, 2018 IL 121932, ¶ 39. We review an as-applied constitutional challenge *de novo*. *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 97.

¶ 51    Defendant cites to *People v. Buffer*, 2019 IL 122327, ¶42, which held that a sentence greater than 40 years imposed upon a juvenile constitutes a *de facto* life sentence. As defendant was not a juvenile at the time he committed these offenses, *Buffer* is inapplicable.

¶ 52    Relying on *People v. House*, 2019 IL App (1st) 110580-B, *appeal allowed*, No. 125124 (Jan. 29, 2020), defendant urges this court to remand for resentencing because he "was only 18 at the time of the offense." In *House*, the 19-year-old defendant was convicted on an accountability theory for his role as a lookout while fellow gang members killed two individuals. *Id.* ¶¶ 14, 17, 29. Based on "defendant's age, his family background, his actions as a lookout as opposed to being the actual shooter, and lack of any prior violent convictions," this court held "that defendant's mandatory sentence of natural life shocks the moral sense of the community." *Id.* ¶¶ 64, 65. Defendant's case was remanded for a new sentencing hearing to give the defendant "the opportunity to present evidence to support his claim that he [did] not deserve a mandatory sentence of natural life." *Id.* ¶ 65.

¶ 53    In *House*, "defendant's sentence involved the convergence of the accountability statute and the mandatory natural life sentence." Here, defendant physically fired multiple shots at Weatherspoon and Burrell while they sat in their vehicle. See *People v. Handy*, 2019 IL App (1st) 170213, ¶ 40 ("[w]hether a defendant physically committed the offense is a significant consideration for courts tasked with deciding whether to extend *Miller* principles to a young adult under the proportionate penalties clause").

¶ 54    Defendant generally argued in the trial court that "the imposition of 'mandatory' terms here deprived [him] of a meaningful sentencing hearing," but offered no "evidence on how the evolving science on juvenile maturity applied to him as an adult." *Harris*, 2018 IL 121932, ¶ 46. Because "a reviewing court is not capable of making an as-applied finding of unconstitutionality in the

'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court," the record is not sufficiently developed for us to review this claim. *Id.* ¶¶ 41, 46. Although we decline to remand for a new sentencing hearing, defendant is free to raise "his as-applied challenge" in a post-conviction proceeding. *Id.* ¶ 48.

¶ 55    For the forgoing reasons, defendant's convictions and sentences are affirmed.

¶ 56    Affirmed.

¶ 57    PRESIDING JUSTICE WALKER, dissenting:

¶ 58    I respectfully dissent because the majority opinion, like the opinion in *People v. Bell*, 2021 IL App (1st) 190366, condones trial by innuendo and gives police officers an avenue to tell witnesses which person officers want the witnesses to choose from a lineup.

¶ 59    Defense counsel, in the posttrial hearing on Brown's allegations of ineffective assistance of counsel, clarified that he intentionally used a strategy of relying on insinuation and innuendo, not evidence.  The majority finds defense counsel's strategy not objectively unreasonable.

¶ 60    Defense counsel asked Weatherspoon whether she previously said, "they were like 20 feet away from me. Somebody shot at me from 20 feet away."  Weatherspoon answered, "No." Defense counsel asked whether she described a shooter as 6 feet tall and 200 pounds.  She denied giving any such description.  When counsel asked whether she told detectives that the shooter had a two-toned gun, this colloquy followed:

"A. Yes, I told the detectives when I was in the hospital that it was silver and black.

*** Q. Is that before you showed them the photographs of the gun?

A.  Yes, that is before."

¶ 61    Defense counsel did not present available evidence that Weatherspoon initially said the shooter stood about 20 feet away, that Weatherspoon initially described one of the shooters as 6

feet tall and 200 pounds, and that she told detectives about the two-toned gun only after she saw the picture posted on Twitter. Counsel explained:

> "I had a police report in front of me. I'm standing in front of the jury with a police report in my hand and I'm making the point on cross-examination didn't you tell officer so and so ***, didn't you say this or that ***. But I made my point in front of the jury holding a police report.
>
> The juries in my experience, once you get that question out ***, they give me some credibility in that regard.
>
> I got it out in front of the jury and the jury heard it."

¶ 62 Defense counsel admitted that he adopted the strategy of hoping the jurors would draw several inferences from the questions he asked. First, he expected them to infer that he held a police report. Second, he expected them to infer, solely from his insinuation, that the report said Weatherspoon saw the shooter from 20 feet away, she described one shooter as 6 feet tall and 200 pounds, and she did not tell detectives about the two-tone gun until some time after she saw the defendants' pictures on Twitter. All counsel "got *** out in front of the jury," all "the jury heard," was his insinuation about the content of a report not in evidence. Counsel expressly preferred insinuation and innuendo to the presentation of available evidence. The majority expressly condones this preference as an objectively reasonable choice.

¶ 63 The majority further condones the innuendos, the statements lacking evidentiary support, in the prosecutor's closing argument. The prosecutor started the closing argument:

> "You ain't dead yet, but you can be.
>
> What was that Laquita said from the witness stand about this tweet?
>
> She said, they figured out I'm still alive."

¶ 64    Despite the complete absence of evidence about who created the account that sent the tweet or which computer sent the tweet, the prosecutor insinuated that Brown or Bell sent the tweets, and then, prosecutors used the tweets as evidence that Brown and Bell threatened Weatherspoon. Again, with no evidence of the source of the tweets, the prosecutor argued:

"We know who those tweets were coming from.  If it were not for these tweets, maybe they are never caught ***.

They were bragging about it.  They were threatening the victim."

¶ 65    The court in *People v. Hood*, 229 Ill. App. 3d 202, 218 (1992), stated the principles applicable to evidence of threats:

"Although evidence of a defendant's intimidation of a witness is admissible because it is probative of consciousness of guilt, it is admissible only if there is actual evidence that the defendant made those threats. [Citation]. Prosecutorial comments that suggest that a witness was afraid to testify because defendant had threatened or intimidated her, when not based on any evidence in the record, are highly prejudicial and inflammatory."

¶ 66    The tweets here function as evidence Brown and Bell threatened Weatherspoon and bragged about shooting her only if Brown and Bell sent the tweets.  *People v. Kent*, 2017 IL App (2d) 140917, and *United States v. Vayner*, 769 F.3d 125 (2d Cir. 2014), discussed the introduction into evidence of social media postings for purposes similar to those for which the prosecution used the tweets here and in *Bell*.

¶ 67    In *Vayner*, the trial court permitted the prosecution to introduce a Facebook page about the defendant into evidence and treat it as though the defendant created the page.  On appeal from the defendant's conviction, the court noted that the Facebook page held "information *about* [the defendant] ***: his name, photograph, and some details about his life ***. But there was no

evidence that [the defendant] himself had created the page or was responsible for its contents." (Emphasis in original.) *Vayner*, 769 F.3d at 132. The *Vayner* court compared the webpage to a flyer found on the street and considered what the court should have done if such a flyer correctly identified the defendant's Skype address. The court said, "the district court surely would have required some evidence that the flyer did, in fact, emanate from [the defendant]. Otherwise, how could the statements in the flyer be attributed to him?" *Id.*

¶ 68    The *Kent* court relied on the reasoning of *Vayner*. The trial court in *Kent* allowed prosecutors to introduce into evidence a Facebook post from "Luckii" which said, "leave em dead n his driveway." *Kent*, 2017 IL App (2d) 140917, ¶ 57. The prosecutors claimed that in the post the defendant, nicknamed "Luckii," admitted shooting the victim who had been shot to death in his driveway. The *Kent* court reasoned:

"Creating a Facebook account is easy. [Citation.] [A]nyone at least thirteen years old with a valid e-mail address could create a profile. [Citation.]

Not only can anyone create a profile and masquerade as another person, but such a risk is amplified when a person creates a real profile without the realization that third parties can mine their personal data. [Citation.] Friends and strangers alike may have access to family photos, intimate details about one's likes and dislikes, hobbies, employer details, and other personal information, and, consequently, the desire to share information with one's friends may also expose users to unknown third parties who may misuse their information. [Citation.] Thus, concern over authentication arises because anyone can create a fictitious account and masquerade under another person's name. [Anyone] can gain access to another's account by obtaining the user's username and password, and consequently, the potential for fabricating or tampering with electronically stored information on a social

networking website is high and poses challenges to authenticating printouts from the website.

As in *Vayner,* the State simply offered no evidence that any of the information on the Facebook post was known or available only to defendant or, at the very least, to a small group of people, including defendant. [Citation.] Worse yet, others who were familiar with defendant might have been motivated to create the post to falsely attribute an incriminating statement to defendant ***.

The ease in fabricating a social media account to corroborate a story means that more than a simple name and photograph are required to sufficiently link the communication to the purported author under Rule 901." (Internal quotation marks omitted.) *Kent*, 2017 IL App (2d) 140917, ¶¶ 105-18; See Ill. R. Evid. 901 (eff. Sept. 17, 2019)

¶ 69 The prosecution here presented no evidence to show that Brown or Bell posted the tweets, and therefore the prosecution failed to meet the requirements of *Kent* for the use the prosecution made of the tweets. The prosecution's improper insinuation that Brown posted the tweets and threatened Weatherspoon should lead this court to reverse the convictions.

¶ 70 The affirmance of the convictions here and in *Bell* creates new problems. If police or prosecutors want a witness to identify a known suspect as an offender, they now know they can suggest a specific identification through a disguised account on social media, which they can use to post a picture of the suspect, accompanied by incriminating text, prior to any lineup. "A showing by police of a suspect standing alone, in what is often described as a 'show-up,' has been observed to carry with it a dangerous degree of improper suggestion. [Citation.] Too, it can be said that where, as here, there is a showing of a suspected accomplice after viewing of the first suspect,

either alone or together with the first suspect, the danger of suggestion, by association, is increased**.**" *People v. Blumenshine*, 42 Ill. 2d 508, 511-12 (1969). "The display of pictures of [the defendant] alone was the most suggestive, and therefore the most objectionable, method of pretrial identification." *Kimbrough v. Cox*, 444 F.2d 8, 10 (4th Cir. 1971). If the decisions here and in *Bell* stand as law, the "most objectionable[] method of pretrial identification" may also become the most widespread method of pretrial identification. Without evidence proving that the defendant sent the tweet used in the identification process, the trial court should not have admitted the tweets into evidence. Without proof of the source of the tweets that led to identifying the defendants as the offenders, the court should have questioned the admissibility of Weatherspoon's in-court identifications of Brown and Bell as the shooters.

¶ 71    I cannot condone trial by innuendo. I cannot condone procedures that permit police officers to suggest to a witness the identification of a specific suspect as an offender. Accordingly, I respectfully dissent.